**ACCARINO v. UNITED STATES.**

No. 10183.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 5, 1949.

Decided Nov. 7, 1949.

Mr. Joseph J. Lyman, Washington, D. C., for appellant.

Mr. Joseph M. Howard, Assistant United States Attorney, Washington, D. C., with whom Mr. George Morris Fay, United States Attorney, and Mr. C. Frank Reifsnyder, Assistant United States Attorney, Washington, D. C., were on the brief, for appellee.

Before EDGERTON, PRETTYMAN and PROCTOR, Circuit Judges.

PRETTYMAN, Circuit Judge.

Appellant was indicted, convicted and sentenced in the United States District Court for the District of Columbia for violations of the gambling laws of the District of Columbia.[1] In the course of the trial, certain alleged "numbers slips" and racehorse bets, taken from the person of the accused and found in his room by the police at the time he was arrested, were offered and received in evidence. There had been a motion to suppress that evidence and return the property, which motion was denied.

On October 16, 1948, two police officers, having received information that a man was "picking up numbers" (a form of organized gambling) in a certain vicinity, noticed the appellant and then trailed him as he drove around in the Northwest and Northeast sections of the City, making some ten or twelve stops to enter apartment houses or places of business. At about one-thirty o'clock, p. m., the appellant drove to and entered an apartment house at 1310 Downing Place, Northeast, and remained there. On October 18th, 20th, 21st, 22nd, 25th and 26th, officers trailed the appellant over practically the same route at the same time of day, observing him making the same stops and seeing him finally enter the apartment house at 1310 Downing Place at about the same time each day. Upon four of these days, an "under-cover man" for the police placed numbers bets with an attendant at one of the places where appellant stopped each day. On another day one of the offi-

1. D.C.Code, 1940, tit. 22, §§ 1501, 1502, 1504.

cers looked into appellant's car while appellant was in a building on one of his stops. The officer observed several numbers slips, one of which he took.

1310 Downing Place, Northeast, is a two-story apartment house on the north side of the street. On October 26th two police officers stationed themselves in the hallway of a house on the south side of the street opposite the apartment house. They had not been trailing appellant on this particular day, but they had done so on other days. They were in plain clothes. They had no warrant, either of arrest or for search. Appellant drove up and parked on the south side of the street. He got out of the car, walked across the street, and entered the apartment house. The officers crossed the street and reached the apartment house door just about the time appellant was at the top of the stairs to the second floor. They called to him; one testified that they called, "Wait a minute, police," and the other said they shouted "and told him that we were police". The appellant entered his apartment, which was to the right of the top of the steps, and closed the door. The officers knocked on the door and shouted at the appellant, one of them testifying that they called out, "Police." The door not being opened, the officers broke it down. Upon entering, they saw the appellant standing in the middle of the room throwing papers and envelopes on a small desk. They seized these papers and also searched the appellant, finding a pad and some money in his pocket. They placed him under arrest.

The immediate question is whether the papers which were seized by the officers at the time of the arrest were properly admitted in evidence against appellant upon his trial. The Government says that the evidence was properly admitted, because it was seized as an incident to a lawful arrest. The appellant says that it was not admissible, because there was no search warrant; and that the arrest was not lawful, since the officers, being without an arrest warrant, illegally broke open the door to his dwelling place.

The Government argues that the officers had probable cause to believe that appellant had committed a felony and that, therefore, they had a right to arrest him without a warrant; that, having a right to arrest, they had a right to use whatever force was necessary to effectuate the arrest; and that the breaking of the door was necessary to make the arrest.

For a clear answer to the question presented, we need hardly go farther in the authorities than McDonald v. United States.[2] In that case, the accused was convicted on evidence obtained by a search made without a warrant, the indictment being for violation of the gambling laws, as in this case. The accused had been under police observation for several months. He lived in a rented rooming house. On the day of the arrest, three police officers surrounded the house, and one of them thought he heard an adding machine. One officer opened a window, climbed through, identified himself to the landlady, and admitted the other officers to the house. McDonald's room was on the second floor. The door to the room was closed. One of the officers stood on a chair and looked through the transom. He saw McDonald and also saw numbers slips, piles of money, and adding machines. He yelled to McDonald to open the door, and McDonald did so. Thereupon, the officers arrested McDonald and seized the machines, the papers, and the money. The prosecution sought to build the lawfulness of the search on the lawfulness of the arrest. The Court said that the reasoning of the prosecution ran: So far as McDonald was concerned, the officers were lawfully in the hallway; since they observed him in the act of committing an offense, they were under a duty to arrest him; therefore, the arrest was valid; and since the search was incidental to the arrest, it too was valid.

The Court held that, whether that argument was or was not logically sound, no necessitous circumstance precluded the obtaining of a warrant before the arrest and

2. 1948, 335 U.S. 451, 69 S.Ct. 191, 192, 93 L.Ed. —,

search and that, therefore, the search was illegal. The Court said:

"We do not stop to examine that syllogism for flaws. Assuming its correctness, we reject the result.

"This is not a case where the officers, passing by on the street, hear a shot and a cry for help and demand entrance in the name of the law. They had been following McDonald and keeping him under surveillance for two months at this rooming house. The prosecution now tells us that the police had no probable cause for obtaining a warrant until, shortly before the arrest, they heard the sound of the adding machine coming from the rooming house. And there is vague and general testimony in the record that on previous occasions the officers had sought search warrants but had been denied them. But those statements alone do not lay the proper foundation for dispensing with a search warrant.

"Where, as here, officers are not responding to an emergency, there must be compelling reasons to justify the absence of a search warrant. A search without a warrant demands exceptional circumstances, as we held in Johnson v. United States, supra [333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436]. * * * We cannot allow the constitutional barrier that protects the privacy of the individual to be hurdled so easily. Moreover, when we move to the scene of the crime, the reason for the absence of a search warrant is even less obvious. When the officers heard the adding machine and, at the latest, when they saw what was transpiring in the room, they certainly had adequate grounds for seeking a search warrant.

"Here, as in Johnson v. United States and Trupiano v. United States [334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663], the defendant was not fleeing or seeking to escape. Officers were there to apprehend petitioners in case they tried to leave. Nor was the property in the process of destruction nor as likely to be destroyed as the opium paraphernalia in the Johnson case. Petitioners were busily engaged in their lottery venture. No reason, except inconvenience of the officers and delay in preparing papers and getting before a mag-istrate, appears for the failure to seek a search warrant. But those reasons are no justification for by-passing the constitutional requirement, as we held in Johnson v. United States, supra, 333 U. S. at p. 15 [68 S.Ct. at page 369, 92 L.Ed. 436].

"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative."

Mr. Justice Jackson, concurring in both the judgment and opinion of the Court, added his own comments, among which was: "Even if one were to conclude that urgent circumstances might justify a forced entry without a warrant, no such emergency was present in this case. This method of law enforcement displays a shocking lack of all sense of proportion. Whether there is a reasonable necessity for a search without waiting to obtain a warrant certainly depends somewhat upon the gravity of the offense thought to be in progress as well as the hazards of the method of attempting to reach it. In this case the police had been over two months watching the defendant McDonald. His criminal operation, while a shabby swindle that the police are quite right in suppressing, was not one which endangered life or limb or the peace and good order of the community even if it continued

another day or two; neither was the racket one the defendant was likely to abandon. Conduct of the numbers racket is not a solitary vice, practiced in secrecy and discoverable only by crashing into dwelling houses. The real difficulty is that it is so little condemned by otherwise law-abiding people that it flourishes widely and involves multitudes of people. It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve no violence or threats of it."

The decision and opinions of the Court in the McDonald case were premised upon many cases which are cited in those opinions but which it is unnecessary for us to describe in detail here. Full discussion of search of a moving vehicle without a warrant is in Brinegar v. United States,[3] decided upon authority of Carroll v. United States,[4] in which the distinction between search of a dwelling and search of a moving vehicle was emphasized. Practically since the beginning of the Government, the Court said, a necessary difference has been recognized.

The search in the case at bar had even less basis for validity than had the search in the McDonald case. In the case at bar, there was an actual breaking of the door to the apartment, while in the McDonald case that door was opened to the officers. In the case at bar, the officers did not see a crime being committed at the time of the arrest, whereas, in the McDonald case, they actually saw McDonald in the act of committing the offense. Otherwise, the two cases seem almost identical.

Disregarding, as the Supreme Court did in the McDonald case, the niceties of the reasoning of the prosecution in the case at bar, the decision and opinions in the McDonald case require that we reject the end result, which is the use of the seized evidence against the accused upon his trial.

The Government cites a long line of cases in support of the proposition that officers making an arrest without a warrant for a felony committed in their presence "may even break down the doors of a house if they have reason to believe the person to be arrested is within."[5] Examination of the cases cited shows that in every one, with the exception of the Agnello case, the officers had a warrant. And in the Agnello case there was no breaking or other semblance of illegal entry to make the arrest, and the search was made at another place some blocks away. In the course of the opinion in that case, the Court pointed out that "Congress has never passed an act purporting to authorize the search of a house without a warrant"; that, on the other hand, Congress has made it a criminal offense for any officer of the United States "engaged in the enforcement of any law to search a private dwelling house without a warrant directing such search"; that safeguards similar to the Fourth Amendment have been provided in the constitution or laws of every State; and that "We think there is no state statute authorizing the search of a house without a warrant." 269 U.S. at pages 32–33, 46 S.Ct. 4, 6, 70 L.Ed. 145, 51 A.L.R. 409.

3. 1949, 338 U.S. 160, 69 S.Ct. 1302.

4. 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L. Ed. 543, 39 A.L.R. 790.

5. The citations of the Government on the point are: United States v. Faw, D.C., 1808, Fed.Cas.No.15,079, 1 Cranch C.C. 487; Kelsy v. Wright, Conn. 1783, 1 Root 83; State v. Shaw, Conn. 1789, 1 Root 134; Hawkins v. Commonwealth, 1854, 53 Ky. 395 [reprint page 318], 61 Am.Dec. 147; Barnard v. Bartlett, Mass. 1852, 10 Cush. 501, 503, 64 Mass. 501, 503, 57 Am. Dec. 123; Commonwealth v. Reynolds, 1876, 120 Mass. 190, 196, 21 Am.Rep.

510; State v. Smith, 1818, 1 N.H. 346, 347; State v. Mooring, 1894, 115 N.C. 709, 20 S.E. 182; State v. Shook, 1944, 224 N.C. 728, 733, 32 S.E.2d 329, 333; 1 East, Pleas of the Crown 321–324 (1806); Foster, Crown Law 320–321 (1776); Note, 5 A.L.R. 263 (1920); Agnello v. United States, 1925, 269 U.S. 20, 28–30, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409; Gibson v. United States, 1945, 80 U.S.App.D.C. 81, 83, 149 F.2d 381, 383, certiorari denied sub nom. O'-Kelley v. United States, 1945, 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429.

We have also examined "the numerous cases set forth in the Note at 5 A.L.R. 263." In so far as they deal with the breaking of doors without a warrant, they concern the prevention of threatened crimes of violence and the quelling of disturbances of the peace, except for the one case of Commonwealth v. Phelps.[6] In that case the court made the unequivocal statement that "An officer who has the right to arrest without a warrant because he suspects on reasonable grounds that the defendant has committed a felony, has a right to break open doors", and cited 4 Blackstone's Commentaries 292; 1 Hale's Pleas of the Crown 588; 2 Hale's Pleas of the Crown 94; Semayne's case, 1603, 77 Eng.Rep.R. 194; Foster's Crown Law 321; and 2 Hawkin's Pleas of the Crown, c. 14, § 7. This and the Government's citation of 1 East's Pleas of the Crown 321–324 and Foster's Crown Law 320–321 bring us to examine briefly the ancient authorities of the common law upon the proposition before us.

In the 13th Yearbook of Edward IV (1461–1483), at folio 9, is a passage relating to arrests.[7] It says that for a felony or for suspicion of felony a man might break a house to take the felon, because it is for the common weal to take him and also because the King has an interest in felony, and where he has an interest the writ is a non omittas. The ancient writ is, of course, our warrant, and the expression "suspicion of felony" refers to a charge before indictment. The reasoning of the passage indicates clearly that a writ was essential to a lawful breaking into a house for purposes of arrest. Coke (1552–1634) was of opinion that for a justice of the peace to issue a warrant upon suspicion to break open a house to search for a felon, was against Magna Carta and also against the decisions of the courts. He

said that if a party suspected be indicted, then the sheriff, by force of the King's writ, could break open the house. In his Fourth Institutes he elaborated his views on the question, and his reference to the Yearbook above mentioned shows that he understood the passage to mean that the breaking of a house was limited to cases in which a writ had issued.[8] Semayne's case,[9] which is usually cited as an authority upon this subject, really concerned a writ issued in a civil case, but the court discussed the rights of a sheriff, in cases when the King was a party, to break into a house either to arrest a felon "or to do other execution of the K.'s process".[10] The discussion seems to contemplate a warrant as essential.

Hale (1609–1676) was of opinion that a constable could arrest a felon ex officio, that is, without a warrant, upon suspicion of felony, and that when a felony had actually been committed the constable had power to break open a door to make the arrest. He wrote that if there were merely suspicion or probable grounds to suspect a person to be a felon, "if the supposed offender fly and take house, and the door will not be opened upon demand of the constable and notification of his business, the constable may break open the door, tho he have no warrant." He reasoned that whenever a constable had an obligation to arrest "there is virtually a non omittas".[11] There is some debate as to whether Hale intended to limit the right to break open a door to a case of flight,[12] but no clear conclusion upon that point can be drawn. However, in the First American Edition of Hale, published in 1847, the learned editors appended as a footnote to the discussion of this subject in the text, a quotation from Burn's Justice of the Peace, reading "But the breaking an outer

---

6. 1911, 209 Mass. 396, 95 N.E. 868, 873, Ann.Cas.1912B, 566.

7. In view of the many times this passage is cited by the authorities, it is interesting to note that Lord Ellenborough pointed out in Burdett v. Abbot, 14 East 1, 155, 104 Eng.Rep.R. 501, 560 (K.B. 1811), that the passage "appears to have been a merely extra-judicial subject of discussion".

8. Co. 4th Inst. *177.

9. 5 Co. Rep. 91a, 77 Eng.Rep.R. 194 (K. B., reported by Coke).

10. Id. at 91b, 77 Eng.Rep.R. 195.

11. 2 Hale, Pleas of the Crown 90–92 (1st Am. ed. 1847).

12. See footnote 12, 2 Hale, op. cit. supra note 11, at 92.

door is in general so violent, obnoxious and dangerous a proceeding that it should be adopted only in extreme cases where an immediate arrest is requisite."

Hawkins, whose work on Pleas of the Crown was first published in 1716, had a chapter on "Where Doors May Be Broken Open in Order to Make an Arrest." He enumerated seven instances in which a person authorized to arrest another might justify breaking open the doors,[13] the fifth instance being where a person known to have committed a felony was pursued with or without a warrant. In that instance, the author said: "But where one lies under a probable suspicion only, and is not indicted, it seems the better opinion at this day, that no one can justify the breaking open doors in order to apprehend him."

Dalton [14] also listed the cases in which it was lawful for the King's officers by force to break open a man's house to arrest offenders therein. He listed as one case "For the Apprehending of any Person for Treason, Felony or Suspicion of Felony", but, although he did not so say, his discussion indicates that he contemplated a warrant in that instance.

Foster [15] in his work on Crown Law wrote that where a felony had been committed or a dangerous wound given, doors might be forced to make an arrest, but he added: "but bare suspicion touching the guilt of the party will not warrant a proceeding to this extremity, though a felony hath been actually committed; unless the officer cometh armed with a warrant from a magistrate grounded on such suspicion." [16]

Burn, whose work on the Justice of the Peace and Parish Officer was first published in 1754, had much the same discussion as had Hawkins, whom he frequently cited. Burn gave the same precaution "that the law doth never allow of such extrem-

ities but in cases of necessity" and listed the instances in which a person authorized to arrest might justify breaking open doors. The second instance was:

"Where one known to have committed a treason or felony, or to have given another a dangerous wound, is pursued either with or without a warrant, by a constable or private person; but where one lies under a probable suspicion only, and is not indicted, it seems the better opinion at this day (Mr. Hawkins says) that no one can justify the breaking open doors in order to apprehend him: (And this opinion he founds on Coke's 4 Inst. 177. and Hale's pleas of the crown 91.) 2 Haw. 87.

"But lord Hale, in his history of the pleas of the crown, says, that upon a warrant for probable cause of suspicion of felony, the person to whom such warrant is directed, may break open doors to take the person suspected, if upon demand he will not surrender himself, as well as if there had been an express and positive charge against him; and so (he says) hath the common practice obtained, notwithstanding the contrary opinion of Lord Coke: for in such case the process is for the king, and therefore a non omittas is implied. 1 H.H. 580, 583. 2 H.H. 177." [17]

In the text of later editions of Burn [18] appears the statement which was appended as a footnote in the First American Edition of Hale, i. e., "But the breaking an outer door is, in general, so violent, obnoxious, and dangerous a proceeding, that it should be adopted only in extreme cases, where an immediate arrest is requisite."

Blackstone (1723–1780) treated very briefly the subject in which we are interested. He said that in case of felony actually committed, or a dangerous wounding, whereby a felony is like to ensue, a constable might upon probable suspicion arrest the felon "and for that purpose is au-

13. 3 Hawkins, Pleas of the Crown, c. 14, p. 183 (7th ed. 1795).

14. Dalton, Country Justice, c. 127, p. 300 (1742).

15. Foster wrote between 1746 and 1776 when the Second Edition of his work on Crown Law was published.

16. Foster, Crown Law 321 (2d ed. 1776).

17. 1 Burn, Justice of the Peace and Parish Officer 87 (6th ed. 1758).

18. E. g., 1 Burn, Justice of the Peace 303 (30th ed. 1869).

thorized (as upon a justice's warrant) to break open doors, and even to kill the felon if he cannot otherwise be taken".[19] While Blackstone did not express a warning as to necessitous circumstances, it would seem clear that in joining the breaking of doors and the killing of the felon, he contemplated necessitous circumstances; and this is particularly clear in view of the expression "if he cannot otherwise be taken". Blackstone cited both Hale and Hawkins. East[20] quoted and discussed both Hale and Hawkins and repeated the precautionary note which appears in Foster and in Hawkins.

Russell[21] says: "Though a felony has actually been committed, breaking doors to arrest a person suspected of the crime cannot be justified unless the officer comes armed with a justice's warrant, or if the officer acts without warrant he does so at his peril." He cites Foster and Hawkins as authority for his text and appends a footnote reading: "According to earlier authorities the constable could break in without warrant on reasonable suspicion of felony." As authority for that footnote, he cites Hale and the Yearbook of Edward IV. It seems clear that this learned author considered that Hale's view of the breaking of a door without a warrant on reasonable suspicion of felony had been superseded.

It is of interest to us in the case at bar that there is no division of opinion among the learned authors we have been discussing upon the proposition that even where an officer may have power to break open a door without a warrant, he cannot lawfully do so unless he first notifies the occupants as to the purpose of his demand for entry.

This brings us to a brief consideration of some American cases. Among those frequently cited are those cited by the Government in the case at bar and which we have discussed hereinabove. We have examined others which are also frequently cited. McLennon v. Richardson[22] was a tort action against a constable for breaking into a shop, without a warrant, to arrest the owner for unlawfully selling liquor and gambling. The court held that the breaking was not justified, saying, in part, that the facts "do not fall within that class which requires the immediate intervention of legal authority, on account of the grave nature of the offence, or because they actually disturb the public peace." In Commonwealth v. Tobin,[23] a constable entered a house by opening an unlocked door after he had heard loud noises, amounting to a disturbance of the peace, in the middle of the night. The court held the entry lawful. Read v. Case[24] concerned the rights of a person who had gone bail for an accused and who, having been admitted to the house of the accused, opened the door to police officers, who thereupon entered and arrested the accused. The court held the entry justifiable. Shanley v. Wells[25] concerned the power of a police officer to arrest without a warrant for vagrancy. The court quoted Blackstone, including that part of the sentence which referred to breaking open doors, but there is no indication that there was any such breaking of doors in the case before the court. The court made no comment upon the breaking of doors. Argetakis v. State[26] concerned a search which was made after an arrest, but there was no illegal entry. The outer door was opened, and the officers were admitted. The court carefully stated the premise "access to appellant's lodgings lawfully obtained * * *."

In Smith v. Tate,[27] the facts were that late at night a sheriff was advised that a murder had been committed, and he thereupon went in pursuit of the alleged murderer. In the course of that pursuit, he

19. 4 Bl. Comm. *292.

20. 1 East, Pleas of the Crown 322 (1806).

21. 1 Russell, Crime 440 (9th ed. 1936).

22. Mass.1860, 15 Gray 74, 77 Am.Dec. 353.

23. 1871, 108 Mass. 426, 11 Am.Rep. 375.

24. 1822, 4 Conn. 166, 10 Am.Dec. 110.

25. 1873, 71 Ill. 78.

26. 1923, 24 Ariz. 599, 212 P. 372.

27. 1921, 143 Tenn. 268, 227 S.W. 1026.

and his deputies went into the house of the accused's uncle through an open door. Sometime thereafter an affray developed. The case was a suit by the occupants of the house against the sheriff for trespass in entering the house. The court relied principally upon McCaslin v. McCord [28] (which actually concerned an escape from jail and the rights of private persons, not officers, to arrest) and reaffirmed its opinion in that case. But there was in Smith v. Tate no breaking of doors. The court held that an officer may enter the house of one other than the suspect when he has reasonable grounds to believe that one suspected of a felony has taken refuge therein. In support of its position, it cited, principally, Commonwealth v. Phelps, supra. The court did not discuss necessitous circumstances as an element, but it is quite clear that the decision could be justified upon that ground, there being a fresh pursuit of an alleged murderer in the nighttime immediately after the crime. Such circumstances hark back to the ancient law of hue and cry.

Commonwealth v. Phelps, the Massachusetts case to which we have already referred, seems to be the most cited American case on the general subject of arrest without warrant. In it the court made the unqualified statement which we have quoted from its opinion. The authorities which the court cited and which we have now discussed do not support the unqualified right but clearly indicate that while there is a right it is qualified in that necessitous circumstances must exist. The decision in the Phelps case could well be supported, because the trial judge, in his instruction to the jury, pointed out that the right to break doors upon suspicion of felony, without a warrant, is qualified, the language of the trial court being "subject always to the qualification that he shall use reasonable judgment and no unnecessary violence or force." The trial judge charged that the jury must determine from all the circumstances whether the officer used reasonable judgment in what he did. The facts in the case were that the accused had stabbed a man late in the afternoon; that there was a question whether the victim would live; that the officer went, during that same night, to the home of the accused and demanded entrance for the purpose of arresting him for the stabbing; that he was refused entrance and thereupon broke the door; and that the accused thereupon shot and killed the officer. The question was whether this killing was murder in the first degree. This involved the lawfulness of the attempted arrest, and the court held it lawful. The facts justified the decision upon the basis of the established rules, taking into account that the whole affair was late in the evening or early in the night and that there had been a stabbing from which death was likely to ensue. It does not seem to us that the unqualified statement of the right to break doors was either supported by the authorities or required by the facts. [29] In a Note on the case, [30] the authors say of it: "The reported case is apparently the only case directly in point as to the right of an officer to break open doors and arrest without a warrant on suspicion of a felony."

Discussions in agreement with our views will be found in Alvau v. United States [31] and in Worthington v. United States. [32]

The whole subject of "Arrest Without a Warrant" is ably and exhaustively treated by Professor Wilgus in his article in Volume 22 of the Michigan Law Review, at pages 541, 673 and 798 (1924). He sums up the discussion of the breaking of doors thus: "Before doors are broken, there must be a necessity for so doing, and notice of the authority and purpose to make the arrest must be given and a demand and refusal of admission must be made, unless this is already understood, or the peril would be increased." (P. 802.)

28. 1906, 116 Tenn. 690, 94 S.W. 79, 8 Ann.Cas. 245.

29. At least two Federal District Court cases appear to rely upon Commonwealth v. Phelps. United States v. Chin On, D.C.Mass.1924, 297 F. 531; United States v. Harnish, D.C.Me.1934, 7 F. Supp. 305.

30. Ann.Cas.1912B, p. 574.

31. 9 Cir., 1929, 33 F.2d 467.

32. 6 Cir., 1948, 166 F.2d 557.

It seems to us clear that from the early days of the common law the breaking of doors to make an arrest without a warrant was lawful only if necessary. Indeed, there was grave doubt among the great authorities that an officer had any power to break doors without a warrant. Care should be taken nowadays that expressions of opinion by those early writers in support of the existence of the power are not misconstrued as assertions of an unqualified power. A man in his own home has a right of privacy which he does not have when on the public street. That additional right imposes additional requirements upon the power of arrest. In District of Columbia v. Little,[33] we said: "We emphasize that no matter who the officer is or what his mission, a government official cannot invade a private home, unless (1) a magistrate has authorized him to do so or (2) an immediate major crisis in the performance of duty affords neither time nor opportunity to apply to a magistrate."

It is said that necessitous circumstances are too uncertain a standard to measure the lawfulness of an arrest. But the basic rule in the law of arrest is the necessity created by the circumstances of the moment. That basic rule is that an officer may use whatever force is necessary. Even the most critical questions arising in the law of arrest, which are when an officer can lawfully shoot and when he can be lawfully shot, depend upon the necessities of the moment. No standard other than the necessities created by the circumstances has yet been devised by our law.

A court is reluctant to suppress evidence which, if obtained in lawful fashion, would have been of compelling importance to a prosecution for felony. But there is no other course by which the court can insist upon compliance by police officers with the requirements of law in respect to arrests and searches. A suspect cannot appeal to a court for an injunction against an officer's kicking his front door down. The applicable rule of law is not difficult to understand. It rests, to be sure, upon the exercise of reasonably sound judgment in appraising the necessities of the moment; but, as we have just said, so does almost every other duty of the police. Unless the necessities of the moment require that the officer break down a door, he cannot do so without a warrant; and if in reasonable contemplation there is opportunity to get a warrant, or the arrest could as well be made by some other method, the outer door to a dwelling cannot be broken to make an arrest without a warrant. The right to break open a door to make an arrest requires something more than the mere right to arrest. If nothing additional were required, a man's right of privacy in his home would be no more than his rights on the street; and the right to arrest without a warrant would be precisely the same as the right to arrest with a warrant. The law is otherwise.

In the latter part of its brief, the Government urges that exceptional circumstances of emergency justified the arrest and search without a warrant in the case at bar. We do not see so much as a shadow of emergency in this case. The officers had had the suspect under observation for days. On the day of arrest, he was not fleeing but was going to his home at the same time of day and in the same manner as he did every day, as the officers knew. The offense of which he was suspected was neither violent nor acute. There was, and had been, plenty of opportunity for the officers to secure warrants, both of arrest and of search. Moreover, they had ample time and opportunity to make the arrest on the street before the suspect entered his home. He parked his car on the side of the street where the officers were, alighted from it, and crossed the street without undue haste. It would appear that the officers deliberately let him get to his own front door before they attempted to approach. If thereafter there was a semblance of emergency requiring the breaking of the door, it was created by the officers.

The Government says that the suspect was in flight and that, therefore, the breaking of the door was justified. There was no flight. The suspect had not been ar-

33. 85 U.S.App.D.C. ——, 178 F.2d 13.

rested, and the officers did not notify him that they wanted to arrest him. The utmost of the "flight" were the two or three steps which the suspect took between the top of the stairs and his own door. The Government says that the suspect failed to obey an "order to halt". The most to which the officers testified was that they called from the bottom of the stairs, "Wait a minute, police." The officers were in plain clothes. The man simply continued on his way the remaining step or so into his apartment. It would be a strange conclusion to apply the vigor of the law of pursuit to such circumstances.

■■ Upon one topic there appears to be no dispute in the authorities. Before an officer can break open a door to a home, ■■■ he must make known the cause of his demand for entry. There is no claim in the case at bar that the officers advised the suspect of the cause of their demand before they broke down the door. Upon that clear ground alone, the breaking of the door was unlawful, the presence of the officers in the apartment was unlawful, and so the arrest was unlawful. It follows that the search was unlawful and the evidence thus procured should have been suppressed.

The judgment of the District Court must be reversed and the case remanded with instructions to grant the motion to suppress the documentary evidence seized at the time of the arrest and to grant a new trial upon the indictment.

Reversed and remanded.