UNITED STATES of America,
Plaintiff,

v.

John Anthony BLANK, Defendant.

UNITED STATES of America,
Plaintiff,

v.

Daniel CARDILLO, Defendant.

Nos. CR65-372, CR65-374.

United States District Court
N. D. Ohio, E. D.

March 4, 1966.

Merle M. McCurdy, U. S. Atty., James L. Oakar, Asst. U. S. Atty., Cleveland, Ohio, for plaintiff.

Jerry Milano, Cleveland, Ohio, for defendants.

CONNELL, Chief Judge.

On October 8th, 1965, at approximately 3:30 P.M., a party of Internal Revenue Service agents advanced upon an apartment building at 3058 Livingston Road, Cleveland, Ohio. Their immediate duty was to execute a search warrant directed to those premises, which had been issued upon the affidavits of Special Agents Nehrer, Kowalski and Mehrling, and which indicated that these premises had housed illegal gambling activities for some time. On their arrival, the agents chose the most direct and least complicated method of ingress to the main premises—they smashed a window next to the outer door of the apartment building and reached through it to open the door. There is no evidence that an attempt was made to "buzz" any apartment. No attempt was made to summon the superintendent so that the raiding party might effect a peaceful entry to the main premises, despite a sign conspicuously posted over the doorbell on which appeared the superintendent's name, apartment number and telephone number.[1]

Having thus gained access to the building, the band of agents quietly advanced on their objective: Apartment No. 6, which had been leased in the name of one Charles Wilson, of whom we have heard no more. (All parties have treated the premises as having been leased to the defendant, John Anthony Blank; therefore, we also recognize him as the tenant in fact. The standing of the defendant, Daniel Pat Cardillo, as a guest on the premises, to object to the method of search has not been challenged by the Government.) Shortly thereafter the sound of splintering wood announced the presence of agents of the United States Government; indeed the sound of axe upon wood all but muffled the simultaneous chant of the agents' "Come on, Johnny Blank, we know you are in there." The agents stumbled over the remains of the defendant Blank's door, and the search was on. The fruits of that search are now the subject of the defendants' Joint Motion to Suppress, in which they stress that the original entrance into the premises was illegal, and the forcible entry into apartment No. 6, without first announcing their identity and purpose, was illegal and that consequently any evidence which is the product of these illegal acts may not be used against the defendants.

The Fourth Amendment to the United States Constitution demands that—

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *.

This constitutional amendment requires that even when warrants are properly issued [2], the conduct of the executing officers must not exceed the bounds of reason.

Part of the boundary of reason is formed by the requirement that officers of the law must announce their presence, identity and purpose prior to their entrance upon private premises to execute a search warrant. The utilization of such procedure prevents, whenever practicable, the violent and forcible violation of the threshold by agents of the law and affords the property owner an initial opportunity to permit a peaceful and orderly search without unnecessary damage to property and without unnecessary disruption of the peace and good order of the home. We need not recant the history of abuses by the English, at which

---

1. There are some discrepancies between the testimony given in the sworn affidavits submitted by the defendants and the unsworn summary of facts tendered by the Government in its brief in opposition to the motion. Because of our decision on the first branch of the motion, where there is no dispute, it is unnecessary to resolve these differences.

2. The defendants have not attacked the issuance of the warrant but have reserved their right to do so at a later date. Because of the decision which we reach today in regard to the execution of those warrants, it becomes unnecessary to appraise their validity.

the Fourth Amendment was aimed by the drafters of the Constitution (Cf. United States v. Rabinowitz, 339 U.S. 56, 68, 70 S.Ct. 430, 94 L.Ed. 653 (1950), dissenting opinion, Frankfurter, J.), nor need we retrace the development of the requirement that enforcement officials must announce at the threshold their presence and purpose. (Cf. Accarino v. U. S., 85 U.S.App.D.C. 394, 179 F.2d 456 (D.C.Cir. 1949)). The deep respect for hearth and home which the Constitution inspires and the profound resolution imbedded there that the threshold shall never suffer an unreasonable official visitation compel the inescapable conclusion that the conduct of the Internal Revenue agents in the instant case transgressed the limits of lawfulness, so that the evidence which is the product of that illegality must be suppressed.

The defendants' argument here casts a threefold thrust: (1) the breaking of the window on the first floor to secure entrance to the common portion of the apartment building was illegal, and this initial illegality permeates the entire search and the fruits thereof; (2) the unannounced invasion by force of defendant John Anthony Blank's apartment was unreasonable in light of all surrounding circumstances, so as to run afoul of the proscription of the Fourth Amendment; (3) that in invading the defendant's apartment the agents failed to comply with certain conditions precedent, explicitly stated in the very statute which gives them authority to make forcible entry when executing warrants.

The first argument brings us to a direct confrontation with the United States Supreme Court's opinion in McDonald v. United States, 335 U. S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). In that case police had kept the accused under surveillance for a period of two months on the suspicion that he was conducting an illegal lottery. On the day in question, as police approached the accused's rooming house, they thought they detected the sound of an adding machine. They forced their way through a window into the landlady's room, identified themselves to her, and persuaded her to lead them to the room occupied by the accused. Peering through the transom outside the accused's room, an officer observed the defendant in the conduct of what appeared to be a gambling operation. They forced their way into his room, arrested him and seized all the slips of paper in his room. The Supreme Court reversed his conviction, which was based primarily upon the evidence so obtained, holding that the conduct of the police officers was unreasonable, the search invalid and the evidence inadmissible. In his concurring opinion, Mr. Justice Jackson sounded a directive which we are constrained to follow here:

> But it seems to me that each tenant of a building, while he has no right to exclude from the common hallways those who enter lawfully, *does have a personal and constitutionally protected interest in the integrity and security of the entire building against unlawful breaking and entry.* Here the police gained access to their peeking post by means that were not merely unauthorized but by means that were forbidden by law and denounced as criminal. In prying up the porch window and climbing into the landlady's bedroom, they were guilty of breaking and entering—a felony in law and a crime far more serious than the one they were engaged in suppressing. Having forced an entry without either a search warrant or an arrest warrant to justify it, the felonious character of their entry, it seems to me, followed every step of their journey inside the house and tainted its fruits with illegality. (pp. 458–459, 69 S.Ct. pp. 194–195). (Emphasis added).

Thus, in the view of Mr. Justice Jackson, despite all that transpired after the police had gained access to the general premises, despite the fact that they saw the defendant in the open operation of a gambling enterprise, and would ordinarily have been entitled to arrest him and to search him and his room because the

perpetration of a crime was exposed to their full and open view, the initial illegality whereby they secured their vantage point permeated whatever followed, and required the supression of all evidence.

We acknowledge that this view was espoused only by Mr. Justice Jackson and Mr. Justice Frankfurter. The opinion of the court (which drew the adherence of only three justices) did not reach the issue before us, since it was felt that the agents had no justification for failing to seek a warrant. Contrary to the Government's contention here, the majority in *McDonald* did not reject a right in the tenant to the integrity of the landlord's property. The Court specifically declined to pass upon the issue which we face:

> The reasoning runs as follows: Although it was an invasion of privacy for the officers to enter Mrs. Terry's room, that was a trespass which violated her rights under the Fourth Amendment, not McDonald's. Therefore so far as he was concerned, the officers were lawfully within the hallway, as much so as if Mrs. Terry had admitted them. Looking over the transom was not a search, for the eye cannot commit the trespass condemned by the Fourth Amendment. Since the officers observed McDonald in the act of committing an offense, they were under a duty then and there to arrest him. See 4 D.C.Code, §§ 140, 143 (1940). The arrest being valid the search incident thereto was lawful.

> We do not stop to examine that syllogism for flaws. Assuming its correctness, we reject the result. (p. 454, 69 S.Ct. p. 192.)

The Government's argument here, as it was in *McDonald*, is that a tenant has no right of privacy in the common portions of an apartment building, so that no tenant may be heard to complain that law enforcement officers effected an illegal entry to that portion of the premises. The Government makes no claim that either a tenant or the landlord admitted the agents or refused to admit the agents to the apartment building. The Government does not deny that the vestibule door of the apartment was broken into, nor does the Government claim that they had an absolute right to make forcible entry into the common premises. The Government simply argues that the defendants have no right to question the agents' initial entry.

The Government supports its position by resorting to United States v. Lewis, 227 F.Supp. 433 (S.D.N.Y.1964), where, it is claimed, the court held that the defendant's only rights to the elevators, stairs and hallways of a multiple building was to use them in common with other tenants, so that a possible trespass on the landlord's rights when the officers gained access to those areas did not invalidate a subsequent search and seizure. In that case the defendant had been under surveillance for some time because she was suspected of involvement in narcotics traffic. On the night of her arrest another suspect was observed entering her apartment building. As this suspect was about to enter the defendant's apartment, he was approached by federal narcotics agents and a scuffle followed. Another agent had been placed on the roof of the apartment building. This agent observed the defendant throwing a package of heroin out into the courtyard of the apartment building after the scuffle in the hallway had apparently alerted her to the presence of the narcotics agents. The arrest of the defendant was predicated upon the observance by the agent upon the roof of her throwing the heroin into the courtyard. Upon this defendant's motion to suppress evidence, the court was faced with this issue:

> The sole question here then is whether the agents obtained the information on which they arrested the defendant—that is to say, the package containing heroin—"from a place within the protection of the Fourth Amendment." Polk v. United States, 291 F.2d 230, 232 (9 Cir.

1961). We are concerned here not with the apartment itself but with the courtyard from which Agent Bowen recovered the package, and with the roof of the building from which Agent Bowen observed the defendant throw it out of her bedroom window. (pp. 435–436)

Commenting upon the fact that the agent's vantage point on the roof did not permit him to peer into the windows of the defendant's apartment, "and thus intrude on her privacy," (p. 437) the court distinguished the case from those situations where "an agent, as a result of an illegal entry upon protected premises," (p. 437) vitiated results of the subsequent search. The court said by way of dictum that the defendant had no constitutionally protected right of privacy to the elevators, stairs and hallways. Inasmuch as this statement or holding was unnecessary in the decision of the motion before the court, we can avoid the import of these statements as mere obitur dicta.

The Government also relies upon United States v. St. Clair, 240 F.Supp. 338 (S.D.N.Y.1965), where another narcotics suspect was arrested in his own apartment. The facts in that case were stated by the court thus:

> Entrance to the building proper, which has five apartments, is through a vestibule on the street level, leading to a common hallway. On either side of the hallway are apartments, the entrance doors of which front onto the hallway. The door from the vestibule to the common hallway is generally locked. On the night of September 18, at about 9:45, after observing lights in the ground floor apartment which led them to believe it was probable their man was there, the agents decided to enter. They encountered one of the tenants of the building at the vestibule door. Exactly what then ensued is somewhat in doubt, but that confusion followed is not.
>
> As the tenant was unlocking the door, the two Federal agents (accompanied by a city detective) approached, stating they wanted to see the tenant who lived in an apartment on the ground floor. She suggested they ring the landlord's bell, which they did. The landlord appeared almost immediately and refused the agents admittance, whereupon one of them identified himself as a Federal narcotics officer. The landlord contended all his tenants were law-abiding. A discussion ensued and there was a general commotion in the vestibule area. At this point, while the vestibule door was ajar, agent Griffin circled the group, reached the door of the apartment on the left and knocked; almost simultaneously the defendant, having heard the commotion outside, opened the door. He was in an undershirt, without eyeglasses. Griffin asked if his name was Wally and if he wore glasses, to which he responded affirmatively. Upon closer observation Griffin was satisfied that he was the "Wally Moore" who had engaged in the activities on July 10. He then told the defendant he was under arrest for violation of the Federal narcotics laws and entered the apartment, followed by the other agent. A search resulted in seizure of narcotics, the subject of this motion to suppress. (p. 339)

The court overruled the motion to suppress, holding that the agent had properly announced his authority and purpose prior to entering the apartment to arrest the defendant, and finding no impropriety in the manner in which the agents gained entrance to the hallway. It is possible to distinguish the *St. Clair* case from the instant case because in *St. Clair* the vestibule door had been left ajar and therefore no forcible entry was required to enter the hallway. Moreover, the landlord had been summoned and had refused to permit the agents to enter after they had apprised him of their mission, whereas, in this case, no attempt was made even to summon the superintendent.

But the sentiments expressed by Judge Weinfeld in *St. Clair* compel us to face squarely the premise upon which he built his holding and to reject his reasoning.

Second, the Court further holds that the means used to gain entrance to the common hallway on which defendant's apartment fronted did not violate his Fourth Amendment right. The hallway, used by tenants and the public alike, was not part of the defendant's apartment. The fact that the door leading to it from the street was locked for the security of the tenants did not make the hallway part of the defendant's dwelling so that his constitutional privilege under the Fourth Amendment extended thereto. To hold otherwise would extend the protection under the Fourth Amendment beyond its purpose. Its essential aim is to protect the right of privacy in one's home and effects against arbitrary and unlawful invasion. (p. 340)

The court's concern was heightened by what appeared to be unnecessary hindrance of normal police investigative activity:

In this circumstance, to hold that the common corridors, public hallways, landings and stairwells may be considered part of the tenant's home and that his right of privacy under the Fourth Amendment extends to such areas, would raise unreasonable barriers to law enforcement. To require, as a condition of a lawful and reasonable search of an apartment, the consent of a tenant or a landlord to admission to the public areas

which give access to the apartment would mean that enforcement officers, having probable cause to arrest, whether with or without a warrant, would in many instances necessarily alert a suspect, thereby affording him ample opportunity to flee or to destroy the fruits or instruments of the crime or contraband. (pp. 340–341)

With that consummate respect which is due to our learned brother, we cannot reconcile his opinion with the historic evolution of the Fourth Amendment, the expanded protection against police privation which the United States Supreme Court has fashioned, a commonsense appraisal of the property rights of modern apartment dwellers nor with the practical realities of an orderly police process.

There is a strong suggestion in the Government's argument, and in the court's opinion in *St. Clair*, that the individual's right of privacy begins at the doorstep to his living quarters. This is historically inaccurate. The Fourth Amendment has drawn the peripheral limits of its protection for private dwellings along boundaries commensurate with the common law curtilage. At common law the curtilage was taken to mean the areas immediately surrounding the dwelling within which the ordinary domestic functions transpired.[3] Bouvier's Law Dictionary defines the term as "The enclosed space immediately surrounding a dwelling-house, contained within the same enclosure." Whether a given area should be included within the ambit of curtilage

---

3. At common law the term was used in determining whether the offense of breaking into a barn or warehouse was burglary. See: 4 Blackstone's Commentaries 224. It is interesting to note in passing that under the law of Ohio the offense of breaking and entering an inhabited dwelling is established by a showing that an accused made forcible entry through the outer door of an apartment building. Cf. State of Ohio v. Brown, 68 Ohio App. 335, 340, 37 N.E.2d 434, 436 (1941): The police officer testified that Irby stated to him in the presence

of Brown, "The door was not locked, he had opened the door and proceeded to the second floor." This statement has reference to the door by which access was had to the stairway that led to the hallway adjacent to the apartment. If that outer door was opened ever so slightly when Irby and Brown had access to the building, even though it was access to a basement not used in connection with the second floor apartment, the act of breaking and entering was complete.

\* \* \* depends upon a number of factors, including its proximity to the dwelling, whether it is within the enclosure surrounding the dwelling, and its use as an adjunct to the domestic economy of the family. United States v. Minker, 312 F.2d 632 (3 Cir. 1962)

The protection of the Fourth Amendment has been extended to:

1. A *barn* 70 to 80 yards from the house. Walker v. United States, 225 F.2d 447 (5 Cir. 1955). Cf. also, Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948).

2. A *smokehouse*, approximately 75 feet from the main farm. United States v. Mullin, 329 F.2d 295 (4 Cir. 1964); Roberson v. United States, 165 F.2d 752 (6 Cir. 1948).

3. A *shed* at the rear of a building. United States v. Carter, 118 F. Supp. 559 (W.D.Pa.1954).

4. A *garage*. Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932).

5. An *outhouse*. Trevathan v. Commonwealth, 384 S.W.2d 500, (Sup.Ct.Ky.1964).

6. A *backyard*. Hobson v. United States, 226 F.2d 890 (8 Cir. 1955).

Framed against such historical concern for the appurtenances and approaches to actual living quarters, the argument of the Government which draws the perimeter of Fourth Amendment protection at the doorstep is out of focus with tradition and precedent. It is quite clear that when Government intrusion crosses the sphere of ordinary domestic activity it runs afoul of the proscription of that amendment. We think it equally clear that protected ingress and egress in hallways and on stairways closed from public intrusion is a normal domestic activity.

What the term "curtilage" means is that area near the dwelling itself which a person has a right to close off from public traffic; drawing the obvious analogy to an apartment, it is comparable to the hallways and staircases of the apartment building. The fact that these areas in an apartment building are common does not weaken the argument for privacy: they are common to the tenants, not to anyone who would break in. These areas of the apartment building are as common to the tenants as the areas within the curtilage are common to all members of the household. From this we conclude that each tenant of an apartment building is offended by the invasion of common premises, in the manner that each member of a household is affronted by the invasion of the curtilage. Thus history will not support the notion that apartment dwellers may be subjected to unreasonable invasion of the hallways and staircases of their apartment buildings.

The Government's argument that the tenant has no protectable interest in the stairways and hallways of the apartment building is but a subtle restatement of another problem area in the law of search and seizure—who has standing to assert the Fourth Amendment violations? We do not think that the Government's action here—forcible entry without notifying anyone of their presence, authority and purpose, and without affording either a tenant or the landlord an opportunity to permit a peaceable entry—comports with the requirement of reasonableness explicitly inscribed in the Fourth Amendment. The question here is really whether the tenant may object.

The United States Supreme Court has been most solicitous in recent years to preserve and to expand the beneficence of the Fourth Amendment to defendants in criminal cases. In pursuit of this policy, in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the court resolved one vexatious problem for defendants by broadening the base from which one may be heard to complain of an unreasonable search. Prior to *Jones,* in order for a person to have standing to object to an allegedly illegal search, it was at least necessary that the

person allege ownership of the articles seized or a proprietary interest in the premises searched greater than that of a licensee or guest. The court rejected this stricture on the free exercise of Fourth Amendment rights:

> We are persuaded, however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. Even in the area from which they derive, due consideration has led to the discarding of these distinctions in the homeland of the common law. See Occupiers' Liability Act, 1957, 5 and 6 Eliz. 2, c. 31, carrying out Law Reform Committee, Third Report, Cmd. 9305. Distinctions such as those between "lessee," "licensee," "invitee" and "guest," often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards. (p. 266, 80 S.Ct. p. 733)

Therefore, the right to challenge search activity was expanded so that—

> * * * anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. (p. 267, 80 S.Ct. p. 734)

As a result of the *Jones* decision, anyone whose presence on invaded premises is not unlawful may object to the fruits of the search. Consequently, in United States ex rel. Eastman v. Fay, 225 F. Supp. 677 (S.D.N.Y.1963), reversed on other grounds, 333 F.2d 28 (2 Cir. 1964), the accused was approached in the hallway of an apartment building by police officers and searched. He was immediately taken to the apartment of the person on whom he had intended to call and was subjected to a further search. Short-ly thereafter one of the officers found some narcotics in a wastebasket *in the hallway* outside of the apartment. The court held that the petitioner had standing to challenge the manner in which the evidence was gathered from the hallway of the apartment building.

If a guest on leased premises has the right to question the manner in which his person is searched in a common hallway, and the manner in which the hallway is searched and evidence is seized from that common hallway, it is the opinion of this Court that a tenant on leased premises has the same right to challenge the manner in which Government agents gained access to the common hallway of his apartment building.

The Government's claim that the tenant has no expectation of privacy and no right to regulate the use of the hallways and stairways of the apartment building must succumb to a commonsense appraisal of the property rights of apartment lessees. We cannot dismiss, as did the court in *St. Clair,* the import of the lock on the vestibule door nor can we disregard the fact that the lock may be opened only by a tenant or the landlord. The lock on the door protects the tenants against the prowler and the pervert, the vandal and the vigilante, the unsolicited solicitor and the unwanted waresman. The tenants possess a joint right, subject to the landlord's right to enter and to use common portions of the premises, to exclude from or to admit to those premises whomever they choose. This area is by no means public. A locked door excluding the public from certain privately owned or leased property denotes a right of privacy therein to those who have the right to lock that door. The lock means simply that the public may not enter—and the Government may not break in with impunity. As we mention above, the fact that these areas are common does not detract from their privacy—these areas are common to the tenants only, not to the public.

We hold that the petitioner does possess a protected interest in the integrity of the entire premises at 3058

Livingston Road, and any unwarranted violation of the privacy of the general premises infringes upon the rights of a tenant in that apartment building. Any conclusion to the contrary would unduly restrict the benign boundaries of Fourth Amendment protection.

■ We do not share the alarm expressed in *St. Clair* against any orderly procedure whereby law enforcement agents request the permission of an apartment manager, owner or tenant to secure entrance to the main premises. The court, in *St. Clair*, assumed that the application for such consent would—

> * * * necessarily alert a suspect, thereby affording him ample opportunity to flee or to destroy the fruits or instruments of the crime or contraband. (240 F.Supp. 338, 341)

We cannot assume that in every instance the landlord is a look-out for his outlaw tenants. If, in a particular case, this would be true, it may provide an excuse for avoiding a general rule which requires the police to seek peaceful entrance. But the general rule ought to be, absent a showing that compliance will frustrate the agents' mission, that Government agents must present themselves, announce their authority and their intent to arrest or to search. Therefore we hold that government agents, when executing a search warrant directed to an apartment, must act in a reasonable manner when entering the main premises of the apartment building. Part of the requirement of reasonable conduct is that the agents seek in good faith to make that entrance in a peaceful manner, by presenting themselves to someone with authority to admit them and then explaining their presence and intention.

Turning to the facts in the instant case, the affidavits upon which the warrant issued indicate that the suspect premises contained a large and varied quantity of papers and materials usable in a gambling operation. As we stated in United States v. Raidl, 250 F.Supp. 278 (D.C.1965):

> * * * we assume that, when an officer of the law swears that he has personal knowledge of the allegedly criminal activity of which he complains, his respect for that oath would educe a truthful statement; * * *.

Consequently we assume that the agents, armed with the knowledge of these facts contained in the affidavits, set out for the apartment on Livingston Road with the firm belief that all the above enumerated items were on the premises. In the light of this knowledge, and including in their considerations the alleged character of the gambling enterprise, the character of the residential area in which the suspect premises were located and the information which they had with respect to the men they expected to be on the premises, were the actions of the Internal Revenue agents reasonable? We think not.

■ Would it be unreasonable to afford the occupants of premises to be searched a few seconds in which they might answer a knock on the door? Is it reasonable to *assume* that the occupants would be able to destroy such a myriad sheaf of gambling paraphernalia in those few seconds? Is it reasonable to *assume* that they would even attempt to destroy these materials? The answer is simple: It is never permissible for agents to *assume* that the occupants of suspect premises will attempt to destroy or hide the objects of an intended search. There must be some tangible, objective evidence, rather than the mere suspicion, intuition or "hunch" of an enforcement officer, upon which a reasonable man could conclude that closed doors are harboring clandestine efforts to destroy or conceal evidence; then, and only then, a forcible invasion of the premises would be reasonable.

There is no evidence here to suggest that this three story apartment building, located in a fashionable residential area, was peculiarly adapted to the quick disposition of the items sought. Nor is there any claim that the apartment was so situated or equipped that a few seconds' warning would precipitate a successful escape by those within the apart-

ment. The farther the accused's quarters from the outer door, the less need for haste and the greater propriety and legality in awaiting for a proper opening from the inside. There is no suggestion that the men expected to be at the apartment are men of violence to whom a warning of police presence might endanger the officers. In short, there is no circumstance which militates for the emergency measures employed by the agents in this case.

 Under all the circumstances which prevailed at the time and place in issue here, we find that the conduct of the Internal Revenue Service agents in forcing their way into the apartment building was unreasonable so as to bring their conduct within the proscription of the Fourth Amendment.

In summary, it is the opinion of this Court that agents who are executing a search warrant directed to a single apartment must act within reason in gaining entrance to the main premises. We further find that, if the outer doors are locked, the agents must afford some authorized person an opportunity to permit them to enter peacefully before force may be employed to effect entrance. We further find that each tenant in an apartment building has a constitutionally protected interest in the integrity of the entire apartment building. We further find that a tenant, or any person whose presence on the premises is not unlawful, has standing to challenge the manner in which government agents secure entrance to the common portions of the apartment —lobby, stairways, elevators and hallways.

We further find that, in the instant case, the action of government agents in breaking and entering the general premises at 3058 Livingston Road was, in the light of all circumstances then and there prevailing, unreasonable. As a consequence, we further find that the agents' action at the time and place in issue infringed upon rights which the Fourth Amendment guarantees to both defendants. We further find that the illegal

character of their entry permeates the entire search with the taint of its illegality, so that all evidence which the agents obtained by reason of their presence on the premises must be suppressed.

It will be so ordered.