**GATEWOOD v. UNITED STATES.**

**No. 11740.**

United States Court of Appeals
For the District of Columbia Circuit.

Argued Oct. 13, 1953.

Decided Dec. 23, 1953.

Clark, Circuit Judge, dissented.

———◆———

Mr. T. Emmett McKenzie, Washington, D. C., for appellant.

Mr. William B. Bryant, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., and William J. Peck, Asst. U. S. Atty., at time of argument, Washington, D. C., on the brief, for appellee. Messrs. Charles M. Irelan, U. S. Atty., at time record was filed, and William R. Glendon, Asst. U. S. Atty., Washington, D. C., at time record was filed, also entered appearances for appellee.

Before CLARK, WILBUR K. MILLER and WASHINGTON, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

The trial judge, sitting without a jury, found Daniel Gatewood guilty of violating penal statutes concerning narcotics. On this appeal, the ultimate question is whether the police had illegally entered Gatewood's apartment when they seized therein the evidence which became the basis of his conviction.

In a somewhat unusual manner, the charge against Gatewood grew out of an unrelated charge against another. Elizabeth Williams was under indictment in the District of Columbia for a narcotics violation. Because she had apparently "jumped bail," a bench warrant was issued for her on September 15, 1952. On September 19, the Metropolitan Police Department sent a teletype message to the Police Department of Dayton, Ohio, which described Elizabeth Williams, said she was wanted here on a bench warrant, told where and with whom she might be found in Dayton, and requested her arrest.

The Dayton police replied by teletype September 22. They advised that Elizabeth Williams had been in Dayton on September 17 and 18, but had left with a woman known as "Candy" and was then reportedly in Hamilton, Ohio, in a rooming house on Chestnut Street, operated by one Remus.

Acting on this information, the Metropolitan Police Department wired the Police Department of Hamilton, Ohio, on September 25. The message described Elizabeth Williams, advised she was wanted here on a bench warrant for "bond jumping," and was reported to be at the Chestnut Street rooming house in Hamilton in company with a woman known as "Candy." A teletype message from the Hamilton police, dated September 25, said Elizabeth Williams had been apprehended as requested, and had waived extradition. On the same date, the local police wired acknowledgment, saying a United States warrant would follow and would be handled by the United States Marshal's office.

During the morning of September 27, 1952, Officer Brewer, of the Narcotics Squad of the Metropolitan Police Department, received an anonymous tip by telephone that Elizabeth Williams could be found in Apartment 39 at 1324 Monroe Street, N.W., in the District of Columbia. Brewer and his fellow squad members, Holcomb and Panetta, knew the bench warrant for her had been issued September 15; so they acted on the telephonic information without making an inquiry at Police Headquarters which would have revealed that, two days before, Elizabeth Williams had been arrested in Ohio under the bench warrant, and was then in custody thereunder. They went to Apartment 39, which they knew was Gatewood's, and one of them knocked on the door. A voice from within asked who was there, and one of the officers replied, "From Western Union." Thereupon Gatewood opened the door, but attempted to close it again when he saw the three men. The policemen forced their way in. According to Panetta, the sole witness for the government, it was after they were already in the apartment that the officers explained their mission to Gatewood in this way:

"We told him we had information that Libby Witt, Elizabeth Etta Williams alias Libby Witt, we had information that she was in his apartment."

They did not indentify her as a fugitive. They did not say a warrant for her arrest was outstanding, nor that they had entered for the purpose of arresting her.

Once inside, the officers saw a Negro girl sitting up in bed in the room beyond. They went in and immediately found she was not Elizabeth Williams. But they did observe a pile of loose white powder lying on a magazine on a dresser. They also saw a glassine envelope containing more white powder, a powder-marked knife, a strainer, and $202 in currency. When questioned, Gatewood said the powder was for his own use by

"snorting." The material was seized and Gatewood was arrested. Later he was indicted, tried and convicted, as we have indicated.

In addition to Panetta's testimony, outlined above, it was stipulated that the government chemist who analyzed the white powder would identify it as 287 grains of heroin hydrochloride, quinine hydrochloride and milk sugar, and would say the knife, the strainer and the magazine showed traces of the same mixture.

 In Accarino v. United States, 1949, 85 U.S.App.D.C. 394, 179 F.2d 456, 465, we reviewed the authorities and found them unanimous in holding that before an officer can break open the door to a home, he must make known the cause of his demand for entry. The government's evidence in this case showed the officers gained entrance to Gatewood's apartment through falsehood followed by force, without first disclosing to him the true reason they desired to enter.[1] "Upon that clear ground alone," as we said in the Accarino opinion, "the breaking of the door was unlawful, the presence of the officers in the apartment was unlawful, and so the arrest was unlawful." [2] The ruling just quoted applies with even greater force where, as here, the unannounced purpose of officers who forcibly invade a citizen's home is not to arrest him but some other person who is thought to be within.

 It is true the officers in the Accarino case had no warrant of any kind, while here a warrant for the arrest of Elizabeth Williams had theretofore been issued and the officers thought it was then outstanding. We regard that factual difference as immaterial; for even if an officer is armed with a warrant of arrest for a person he believes is in another's home, he may not lawfully break and enter the house to make the arrest unless he first discloses his true purpose to the inmates of the house and is refused admittance.[3]

---

1. Entry by stealth can, of course, be as unlawful as entry by the illegal use of force. Gouled v. United States, 1921, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647.

2. 85 U.S.App.D.C. at page 403, 179 F.2d at page 465.

3. "Otherwise it would be impossible for one to know what the object of the person breaking open the door might be, and the owner has a right to consider it an agression on his private property which may be resisted to the utmost. [Cases cited.]"
The foregoing is quoted from the annotations to Hawkins v. Commonwealth of Kentucky, 1854, 14 Ben.Mon. [Ky.] 2d ed. 318, 61 Am.Dec. 147, the note being at page 157.
In Barnard v. Bartlett, 1852, 10 Cush., Mass., 501, 502, 57 Am.Dec. 123, it was said:
"The maxim of law that every man's house is his castle * * * has not the effect to restrain an officer of the law from breaking and entering a dwelling-house *for the purpose of serving a criminal process upon the owner.* In such case the house of the party is no sanctuary for him, and the same may be forcibly entered by such officers *after a proper notification of the purpose of the entry, and a demand upon the inmates* *to open the house, and a refusal by them to do so:* Foster 320, 1 East P.C. 326; 1 Hale P.C. 459; State v. Smith, 1 N.H. 346." (Emphasis supplied.)
The Supreme Court of Tennessee, in Smith v. Tate, 1921, 143 Tenn. 268, 227 S.W. 1026, 1027, quoted with approval the following dictum from its opinion in McCaslin v. McCord, 1906, 116 Tenn. 690, 707, 94 S.W. 79, 83.
"* * * [W]here an officer has reasonable cause to believe that the person named in the warrant, or a person whom he seeks to arrest on a charge of felony, is in the dwelling house of another, he has a right to search the house, and, after demand for admittance and notice of his purpose, to break open doors if necessary to prosecute his search (Com. v. Reynolds, 120 Mass. 190, 21 Am.Rep. 510; Com. v. Irwin, 1 Allen, 587; * * * State v. Brown, 5 Har. [Del.] 505; Barnard v. Bartlett, 10 Cush. [Mass.] 501, 57 Am.Dec. 123) * * *."
The following cases serve also to illustrate the principle: Gibson v. United States, 1945, 80 U.S.App.D.C. 81, 149 F.2d 381; United States v. Colebrook, D.C.S.D.Tex.1931, 52 F.2d 307; United States v. Waller, D.C.N.D.Ill.1952, 108 F.Supp. 450. Cf. Johnson v. United States, 1947, 333 U.S. 10, 17, 68 S.Ct. 367, 92 L.Ed. 436.

██ If the rule just stated were otherwise—that is to say, if it were the rule that the possession or existence of a warrant of arrest for the person sought somehow legalizes an officer's otherwise illegal entry into another's home—we should nevertheless apply the Accarino doctrine here because, when the officers entered Gatewood's apartment, the bench warrant for Elizabeth Williams was not outstanding. The Hamilton police had arrested her two days earlier, and had done so under the bench warrant, even though they did not have it physically in hand. Rule 4(c) (3), Federal Rules of Criminal Procedure, 18 U.S.C.A. Their execution of it exhausted the authority of the warrant, which was thereafter no longer outstanding. Carlson v. Landon, 1952, 342 U.S. 524, 546, 72 S.Ct. 525, 96 L. Ed. 547. So, even if it be thought that an outstanding warrant of arrest for Elizabeth Williams somehow would have justified the otherwise unlawful entry into Gatewood's apartment, such fancied justification was lacking here. An officer's mistaken belief that a warrant is outstanding is not an adequate substitute for a warrant.

The illegality of the officers' action was aggravated by their inexcusable ignorance of the fact that the Williams woman was already in custody, and by the weakness of their reason for believing she was in Gatewood's apartment. They had known for a week or so that the bench warrant had been issued on September 15, and assumed that on September 27 it had not been executed. They took drastic action on that assumption without inquiring at their own headquarters. Had they in-

quired, they would have learned not only that the warrant had been executed and was not outstanding, but also that Elizabeth Williams was not in Gatewood's apartment and that their anonymous information to that effect was incorrect.

On the basis of what has been said, we could end this opinion at this point by holding that the entry was unlawful, the subsequent seizure was unlawful, and the evidence obtained thereby, upon which Gatewood was convicted, should have been excluded, except that the government challenges our right to do so. It says the question whether the seized evidence was admissible is not properly before us and therefore may not be considered and decided. The argument is that a pretrial judge's denial of Gatewood's motion under Rule 41(e), Federal Rules of Criminal Procedure, to suppress the heroin mixture and certain other property for use as evidence, was properly considered by the trial judge as the law of the case which he was bound to follow;[4] and that we cannot review the pretrial judge's ruling of admissibility because a transcript of the evidence before him was not made a part of the record on this appeal.

██ Appellate consideration of the ultimate question in a case must not be frustrated by the parties' failure to include in the record preliminary proceedings which were in reality part of the trial process, and which might be found to be of vital significance.[5] So, before considering the case after it was submitted, we requested the reporter to prepare a transcript of the pretrial hearing and rehearing on the motion to suppress and, *sua sponte*, made

4. The trial judge so held in his opinion. United States v. Gatewood, D.C.D.C.1953, 109 F.Supp. 440. He also said if he were not bound by the pretrial orders, he would nevertheless admit the evidence.

5. Of course, the usual rule is that if a party fails to bring up a sufficient record to reveal the error he alleges, his appeal must fail. Moses v. Hazen, 1934, 63 App. D.C. 104, 69 F.2d 842, 98 A.L.R. 386;

see cases cited in 3 Am.Jur. 213. That rule ordinarily applies to criminal cases as well as to civil ones. Braverman v. United States, 1942, 317 U.S. 49, 63 S. Ct. 99, 87 L.Ed. 23. In the instant case, however, the procedure we followed seemed to us called for in the interest of both parties, and of the due administration of justice. Fed.R.Civ.Proc. rule 75 (h), 28 U.S.C.A., Fed.R.Crim.Proc. rule 39 (b) ; cf. Fed.R.Crim.Proc. rule 52(b).

it a part of the record. Consequently, we now have the whole case before us, and are in a position to review the ruling of admissibility, no matter which judge made the definitive decision that the evidence should be received at the trial.

At the preliminary hearings all three police officers testified concerning their actions at the apartment substantially as Panetta did at the trial. It clearly appeared that the entry was accomplished by the Western Union subterfuge, followed by forcible breaking, without prior announcement of the true cause of the officers' desire to enter. On that clear ground, the pretrial judge erred in denying the motion to suppress.

The illegality of the entry was shown even more clearly at the trial than at the preliminary hearings. It then appeared, as we have already pointed out, not only that the officers entered without first announcing a legal reason for doing so and being denied admittance, but also that the bench warrant for Elizabeth Williams was not then outstanding. The latter fact was established, it will be remembered, by the teletype messages which were first brought to light through Panetta's cross-examination at the trial.

Were it necessary to a decision here, we should be inclined to hold, as we intimated in the Cefaratti case, [6] that under Rule 41(e) a pretrial denial of a motion to suppress, made after indictment, is not binding on the trial judge.[7] But, regardless of which judge made the ruling which actually admitted the questioned evidence, it was error to do so.

Reversed.

6. See United States v. Cefaratti, 1952, 91 U.S.App.D.C. 297, 301, 202 F.2d 13, 16, certiorari denied 345 U.S. 907, 73 S. Ct. 646, 97 L.Ed. 1343, at footnote 5, which reads in part thus:

"After indictment and before trial, an order *denying* a defendant's motion to suppress is not final and not appealable. Cogen v. United States, 278 U.S. 221, 49 S.Ct. 118, 73 L.Ed. 275. Such an order has no 'final and irreparable effect on the rights of the parties.' The motion may be renewed at trial; it may then be granted; and if it is then denied and the defendant is convicted, the denial may be reviewed on appeal from the conviction."

7. Gouled v. United States, 1920, 255 U.S. at pages 312–313, 41 S.Ct. 261, 65 L.Ed. 647. The principle there stated was not affected by the later adoption of Rule 41(e) and is, we think, still controlling.

CLARK, Circuit Judge (dissenting).

It is my opinion that the judgment below should be affirmed and I therefore dissent.