Arthur R. SHEPHERD, Appellant,

v.

UNITED STATES of America,
Appellee.

William MILLER, Appellant,

v.

UNITED STATES of America,
Appellee.

Bessie BYRD, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 12783, 12842, 12843.

United States Court of Appeals
District of Columbia Circuit.

Argued June 21, 1956.

Decided Oct. 18, 1956.

Petition for Rehearing In Banc Denied
Dec. 3, 1956.

Writ of Certiorari Granted May 13, 1957.
See 77 S.Ct. 867.

---

6. S.Rep. No. 1137, 82d Cong., 2d Sess. 22 (1952); see also H.Rep. No. 1365, 82d Cong., 2d Sess. 60 (1952).

Edgerton, Chief Judge, dissented.

Mr. D. A. St. Angelo, Washington, D. C. (appointed by this Court), with whom Mr. Garner J. Cline, Washington, D. C., was on the brief, for appellants.

Mr. Fred L. McIntyre, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Lewis Carroll and Alexander L. Stevas, Asst. U. S. Attys., were on the brief, for appellee. Mr. Leo A. Rover, U. S. Atty., at the time record was filed, also entered an appearance for appellee.

Before EDGERTON, Chief Judge, and WILBUR K. MILLER and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

A first count charged Shepherd, Bessie Byrd and William Miller with conspiracy to violate the narcotics laws, and all were convicted. Shepherd also was charged with the purchase and distribution of 100 capsules of heroin and with facilitating the concealment and sale of the same. The jury found him guilty on all three counts, and he appeals, his argument suggesting that evidence of conspiracy was insufficient, that he was entrapped, and that officers lacked probable cause to stop a taxicab in which he was riding, to arrest him and incidentally to the arrest, to recover from the cab the 100 capsules of heroin as mentioned.

After the arrest of Shepherd, the officers, having found the 100 capsules of heroin, immediately went back to the apartment occupied by Mrs. Byrd and Miller, and, a few minutes later, knocked on the door and announced their identity. Thereupon Miller, known to the officers as a narcotics violator, having opened his door part way, recognized the officers of the narcotics squad and attempted to close the door. As he pulled the door to, the officers resisted his effort to close it, a chain bolt broke, and the officers arrested Miller and Mrs. Byrd. The latter produced some $700 in bills from her housecoat pocket, among which were $34 in marked bills. The further sum of $66 in marked bills which Shepherd had turned in for the heroin, was found in the bedclothing. In the two-room apartment also were found empty capsules and envelopes, and across the hall, in a furnace room, were 381 capsules of heroin, 1,000 empty capsules, a supply of envelopes and paraphernalia for "cutting" or diluting heroin with milk sugar. Two counts, dealing with the items found in the furnace room were dismissed, as Judge Youngdahl decided the Government had not sufficiently proved possession of the furnace room and its contents to be attributable to Mrs. Byrd and Miller. However, the jury found them guilty with Shepherd on the conspiracy count as well as on two substantive counts, one of sale, and the other of facilitating the sale and concealment of heroin. They urge that evidence of conspiracy was insufficient, that the trial judge erred in instructing the jury as to "aiding and abetting," that the prosecutor indulged in prejudicial argument, and that the court erred in denying their motion to suppress the use in evidence of the marked money found in the Byrd-Miller apartment.

 First, as to Shepherd, there was no entrapment in the sense that a criminal design, created by government officers, resulted in implanting in the mind of an innocent person, the disposition to commit an offense which was thus induced that prosecution might follow. Rather, the case comes squarely within the rule which is "well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises."[1] Shepherd was a "contact" man or runner for Byrd and Miller, making outside sales from a source controlled

---

1. Sorrells v. United States, 1932, 287 U.S. 435, 441, 53 S.Ct. 210, 77 L.Ed. 413.

by the other two appellants who received the proceeds of the sales so effectuated.

After Shepherd's arrest, he was brought back to the Miller-Byrd apartment, where he informed Miller "Blue,[2] it wasn't me that turned you around." Although only 17 years of age at the time, Shepherd was already steeped in the code of the underworld after a pattern familiar to the courts, as that remark, coupled with his other conversations with the police clearly showed. That he was linked to the whole nefarious enterprise cannot be doubted.

Again, as to Shepherd, there was no possible question as to probable cause. Officers with a warrant for the arrest of one Reed, an addict, had apprehended Reed at 1:35 A.M. on March 25, 1955. Taken to headquarters and questioned as to his source of supply, Reed disclosed the name of Shepherd, not previously known to the officers, as one who on occasion had purveyed to him narcotics in 100 capsule lots, at $1 per capsule, he said. Shepherd picked up such narcotics from "Blue" Miller in Apt. #1 at 1337 Columbia Road, N.W., in the District of Columbia, he added. He agreed to join a trainee agent named Lewis in arranging for such a purchase, and $100 in marked bills were supplied for the purpose. Reed and Lewis in a cab, trailed by officers, went to 617 M Street where "Blue" Miller's mother lived and where Reed said Shepherd could be located. Reed entered 617 M Street and soon returned with Shepherd who joined Lewis and Reed. The cab then went to Reed's home. It had been prearranged that if Lewis and Reed left the cab at Reed's home, the trailing officers were to understand that Shepherd had received the $100 in marked bills and had gone on alone to his source of supply. The officers, alerted by the enactment of this signal, followed the cab in which Shepherd was a passenger, directly to 1337 Columbia Road, N.W. Shepherd went into the basement entrance. Agent Wilson followed him down to the lighted hallway, saw two doorways opening off the hall, one leading to a furnace room across the hall from the entrance to apartment # 1, and noted Shepherd had disappeared. Retracing his steps, Agent Wilson took up watch from across the street and saw a light appear for a short time in the furnace room, after which the light was turned off and Shepherd reappeared. He reentered his waiting cab which proceeded a short distance only to be stopped by Officer Wurms who directed a flashlight into the driver's face. Taxi driver Hoban testified he then said "This must be the police," or some such statement, whereupon he got out. As he opened the cab door, its dome light came on. Shepherd, on notice by the driver's remark if not otherwise, was seen to place a package under the front seat where he was riding. His door was opened then, an officer reached in, found a manila envelope containing 100 capsules which on field test reacted to disclose the presence of narcotics. Shepherd then was searched, the $100 which had been given to him by Lewis and Reed were not found, and Shepherd said he had picked up the narcotics from behind a fire extinguisher in the basement hallway at 1337 Columbia Road.

That these facts spelled out probable cause to arrest Shepherd cannot be doubted. Shepherd did not deny one iota of the testimony which established the commission of the offense in the presence of the officers. His own statement putting him in the very place where the information of the officers attributable to Reed indicated he would go, together with what the officers had observed and the plan which was in process under their surveillance, brought the case squarely within the Court's ruling in the Scher case,[3] and our own Shettel case.[4]

Moreover, viewing the case as a whole, neither Shepherd nor his co-accused were helped when the only defense testimony identified him as a brother of Mrs. Byrd who admitted Shepherd to the apartment

2. Miller's nickname.

3. Scher v. United States, 1938, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151.

4. Shettel v. United States, 1940, 72 App. D.C. 250, 113 F.2d 34.

that morning. Both Miller and Mrs. Byrd denied to the officers that Shepherd had been at their apartment, but at the trial, a different version developed The only defense witness, Octavia Walker, said she and another woman and Mrs. Byrd, sometime after 1 A.M. went to a night club for drinks. Returning after 2 A.M. to the Byrd-Miller apartment, she said Miller was asleep, and the three women went into the kitchen to fix a "snack." About 2:30 A.M. Shepherd appeared, came into the kitchen and handed his sister $100 for "safe-keeping," saying it was money he had won gambling. After a brief stay, Shepherd left. Shepherd, even by the defense had definitely been placed in the apartment with Miller and Mrs. Byrd and with $100 which he left there. Perhaps neither judge nor jury believed he won the money gambling.

■ There is no substance to the claimed errors with reference to the conspiracy or the instruction as to "aiding and abetting." There was no merger of the substantive offenses, indeed, they were separate and distinct, while the general agreement among the appellants was clearly deducible from the evidence and could be deemed to be continuous and persisting.[5]

■ Nor is there merit to the claim that the argument by Government counsel so prejudiced the appellants that a fair trial was denied. Not only was there a current failure then to object, but upon review we are satisfied there was no error.[6]

What has been or will be said as to the facts will make clear that there is only one question in this case. Miller and Mrs. Byrd in advance of trial moved to suppress the use of the marked money, claiming it had been illegally seized.

The seizure in turn depends upon the validity of their arrest. The supporting affidavit offered by these two appellants recited in part:

"That at about four (4) o'clock, A.M., on the morning of March 25, 1955, they were awakened in their apartment, located at Columbia Road, N.W., Washington, D. C., by the noise created by someone breaking in a doorway in the hallway, leading to their apartment (only), and that upon his cracking* his door (with a chain thereon), to ascertain the origin of said noise, that officers Wilson, Pappas and four others did break the chain off of the door, and forcibly enter his apartment."

Just what happened in exact detail at the doorway to apartment #1 and precisely what was said by the respective participants cannot be determined conclusively from the record before us.[7] The whole episode must have involved only a few seconds. At the hearing on the motion, the only witnesses called, Officer Wurms and Agent Wilson, testified that Officer Wurms knocked on Miller's door, and when a voice from inside asked "Who's there?", Wurms answered, "Blue, police." Miller opened the door and looked out. The officers immediately recognized him and Miller recognized them. "Did he say anything when he opened the door?" "Yes, sir, he didn't want to let us in." "What were his words?" "I can't recall, *but he wanted to know what we were doing there.*" Miller tried to close the door. Officer Wurms tried to keep it open. "He took one look at me and tried to slam the door, at which time I grabbed the door and opened it." The door was not broken, but a door chain was.

5. Pinkerton v. United States, 1946, 328 U.S. 640, 643, 646, 66 S.Ct. 1180, 90 L. Ed. 1489.

6. Cf. Obery v. United States, 1954, 95 U.S. App.D.C. 28, 217 F.2d 860, certiorari denied, 1955, 349 U.S. 923, 75 S.Ct. 665, 99 L.Ed. 1255.

* taken to mean "opening part way."

7. For example, at the trial Agent Wilson on cross-examination testified that Officer Wurms knocked at the door and said: "Blue, open the door, police." A voice inside asked "Who's there?" The knock was repeated, and again the officer said "Blue, open the door, police." That was all that was said until Miller opened the door, looked out, saw who was there, and refused to let the officers enter.

The judge observed that he could only "consider what happened before the search took place."

"The Court: When did you arrest these two defendants?

"The Witness [Wilson]: Immediately upon entering the place."

Announcing his decision pursuant to Rule 41(e) [8] Judge Holtzoff said:

"The Court is of the opinion that there is ample proof of probable cause to make an arrest, and therefore the arrest was legal. The arrest being legal, the search was legal because it was incidental to the arrest."

 This is precisely what we said in the Shettel case, supra note 4. Indeed, from ancient times, it is to be doubted that anyone has seriously denied "the right on the part of the Government, always recognized under English and American law, to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime. This right has been uniformly maintained in many cases [citing cases]" and may be deemed to extend to "proofs of guilt found upon his arrest within the control of the accused." [9] So, as incidental to a valid arrest, at least a limited search, not general or exploratory, for specific evidence may be sustained.[10] Again, "exceptional circumstances" can be a factor.[11]

In United States v. Jeffers [12] there were no "exceptional circumstances";

no one was present, the hotel room could have been guarded while a warrant was procured, there was no arrest "or imminent destruction, removal, or concealment of the property intended to be seized." The Government admitted that the search was unlawful; the Court described the intrusion as "by means denounced as criminal." [13]

In the Johnson case, supra note 11, the Government, in effect, conceded:

"* * * that the arresting officer did not have probable cause to arrest petitioner until he had entered her room * * *. It was therefore their observations inside of her quarters, after they had obtained admission under color of their police authority, on which they made the arrest.

"Thus the Government is obliged to justify the arrest by the search and at the same time to justify the search by the arrest. This will not do." [14]

In McDonald v. United States [15] the activities of the accused were under surveillance for some two months. Here the conspiratorial actions had evolved within a matter of an hour or two and were still current. There, again unlike the present case, the officers were responding to no emergency, and the officers gained access to their vantage point "by means that were not merely unau-

8. Fed.R.Crim.P., 18 U.S.C.A.

9. Weeks v. United States, 1914, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652. And see Morton v. United States, 1945, 79 U.S.App.D.C. 329, 147 F.2d 28, certiorari denied 1945, 324 U.S. 875, 65 S. Ct. 1015, 89 L.Ed. 1428; Beard v. United States, 1936, 65 App.D.C. 231, 82 F.2d 837, certiorari denied, 1936, 298 U.S. 655, 56 S.Ct. 675, 80 L.Ed. 1382; cf. Harris v. United States, 1947, 331 U.S. 145, 154, 67 S.Ct. 1098, 91 L.Ed. 1399, and the cases appended to Mr. Justice Frankfurter's dissent at page 174 et seq. of 331 U.S., at page 1112 of 67 S.Ct.

10. United States v. Rabinowitz, 1950, 339 U.S. 56, 62, 70 S.Ct. 430, 94 L.Ed. 653,

which, incidentally, overruled Trupiano v. United States, 1948, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, at least in part.

11. Johnson v. United States, 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436.

12. 1951, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59.

13. Id. 342 U.S. at page 52, 72 S.Ct. at page 95.

14. 333 U.S. at pages 16-17, 68 S.Ct. at page 370.

15. 1948, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153.

thorized but by means that were forbidden by law and denounced as criminal." [16]

■ Here, as in United States v. Rabinowitz, supra note 10, we may say, with the Court: "Of course, a search without warrant incident to an arrest is dependent initially on a valid arrest. * * * Even if the warrant of arrest were not sufficient to authorize the arrest for possession of the stamps, the arrest therefor was valid because the officers had probable cause to believe that a felony was being committed in their very presence." [17] Probable cause depends upon a reasonable ground for belief of guilt,[18] which surely was shown here. Moreover, the District of Columbia Code 1951 expressly confers the necessary "power and authority" [19] to arrest without warrant in felony cases.

In Mattus v. United States [20] the informant under the eyes of the officers, pursuant to plan and with marked money, entered the defendant's house to purchase narcotics. He shortly returned and handed packages of morphine to the officers. They then entered the house and arrested the accused. "Here there can be no doubt but that the officers had knowledge that some person in the house had committed a felony, and they had reasonable and probable cause to believe that the person who committed it was continuing in the commission of an offense by unlawfully retaining possession of morphine." [21] It was claimed the officers had illegally entered the house. After ringing the bell and knocking on the front window, one called out, " 'Open up; federal officers; narcotic officers.' " Meeting no response, they forced an entrance and rushed to the back of the house, where they caught the defendant in the act of disposing of the money and narcotics in the toilet. The court ruled: "The defendant's house was entered, pursuant to the officers' knowledge that a felony had been committed therein, and the reasonable ground which they had to believe that a felony was being committed in the unlawful retention of morphine, and that probably a further offense was about to be committed in the concealment of morphine. Such breaking and entry were permissible. Wharton's Crim.Procedure (10th Ed.) § 51." [22]

Here, under much stronger circumstances in the light of the facts of record, was a continuing conspiracy in which Shepherd, aged 17, residing in Miller's mother's house, was being used by Miller and his own sister, Mrs. Byrd, to assist them in carrying on their nefarious business which was being operated out of their apartment. The events of the sale, as previously narrated, confirmed in every detail the method of operation described by Reed as having occurred on previous occasions, and executed by known narcotics violators with a previous record of conviction.

In the Agnello case,[23] there was no arrest at the door of the Alba home. The officers looking through a window saw the informant hand over money to Alba. They saw small packages on a table, but did not know what they contained. Of course, they suspected narcotics were being sold.[24] The "agents *rushed in* and *arrested* all the defendants. * * * On searching Alba, they found the money given him by Napolitano [the informer]."[25] (Emphasis supplied.)

16. As Justice Jackson explained, Id. 335 U.S. at page 458, 69 S.Ct. at page 195. And see Nueslein v. District of Columbia, 1940, 73 App.D.C. 85, 115 F.2d 690.

17. 339 U.S. at page 60, 70 S.Ct. at page 432.

18. Brinegar v. United States, 1949, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879.

19. D.C.Code 1951, §§ 4–140, 4–141; and see Shettel v. United States, supra, note 4.

20. 9 Cir., 1926, 11 F.2d 503.

21. Id. 11 F.2d at page 504.

22. Ibid.

23. Agnello v. United States, 1925, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145.

24. Here, the officers knew to a certainty for they had already made their test.

25. Agnello v. United States, supra note 23, 269 U.S. at page 29, 46 S.Ct. at page 5.

"The *legality of the arrests* or of the searches and seizures made at the home of Alba is not questioned." [26] (Emphasis supplied.) The conviction of all accused as conspirators, engaged then and there in Alba's *house* in carrying on the conspiracy, was affirmed, clearly and solely on the ground that the officers had probable cause to "rush in" and arrest for a felony which they had reasonable cause to believe had been committed.[27] A new trial was granted to Agnello only as to cocaine found in *his* home as a result of an unauthorized search and seizure *there* made in his absence.

Against the background of the facts as noted and the law as summarized, we find the officers at Miller's door, knowing that a felony had been committed and having probable cause to believe it was continuing. The statute spelled out their clear duty to arrest.[28] This is not a case were to make the arrest, the officers "rushed in," as in Agnello, supra note 23, or "forced an entrance" without response from within, as in Mattus, supra note 20, where the seizures in the premises of arrest were sustained; nor is it like McKnight v. United States,[29] where the officers broke in after rejecting a convenient present opportunity to make a lawful arrest in a public street, nor yet like Accarino v. United States [30] where the officers actually broke down the door although they had no evidence that the premises had been or were being used in the commission of a felony. Moreover, there they had had the accused under surveillance for many days and had had ample opportunity to secure a search warrant but had failed to do so. As Judge Edgerton wrote in the McKnight case,[31] applying the Accarino principle, and quoting:

" 'It would appear that the officers deliberately let him get to his own front door before they attempted to approach. If thereafter there was a semblance of emergency requiring the breaking of the door, it was created by the officers.' Neither policemen nor private citizens can justify breaking into a house, or other violence, by deliberately creating an alleged necessity for it. Since McKnight's arrest was accomplished by a needless and violent invasion of a private house, it was illegal, particularly since the real purpose of the invasion was not an arrest but a search."

We suggest no impairment of the validity of the holdings in the McKnight and Accarino cases. The instant case is unlike both, is clearer and stronger, and quite within the principles taught. Judge Prettyman pointed out that the law had been summed up thus:

" 'Before doors are broken, there must be a necessity for so doing, and notice of the authority and purpose to make the arrest must be given and a demand and refusal of admission must be made, *unless this is already understood,* or the peril would be increased.' " [32] (Emphasis supplied.)

He expressly noted "Unless the necessities of the moment require that the officer break down a door, he cannot do so without a warrant * * *," [33] and in Accarino, there was no claim that the officers advised the suspect of the cause of their demand before they broke down the door. It does not appear that the accused knew that the police had been following him for days or that he was suspected of complicity in the handling

---

26. Id. 269 U.S. at page 30, 46 S.Ct. at page 5.

27. See Mattus v. United States, supra note 20.

28. D.C.Code, 1951, § 4–143.

29. 1950, 87 U.S.App.D.C. 151, 183 F.2d 977.

30. 1949, 85 U.S.App.D.C. 394, 179 F.2d 456.

31. Supra note 29, 87 U.S.App.D.C. at page 152, 183 F.2d at page 978.

32. 85 U.S.App.D.C. at page 401, 179 F.2d at page 463.

33. 85 U.S.App.D.C. at page 402, 179 F.2d at page 464.

of numbers bets in various other places, much less his own house.

Here the accused himself opened the door. He had heard the officers knock, had heard their identification of him and of themselves, and he responded to their summons. That he was alerted by his experience in his business and by the events so recently transpiring and still in progress is not to be doubted. A previous violator, he knew at least some of the narcotics officers named by him in his affidavit—"He took one look at me and tried to slam the door * * *."— Without more than brief further reference to the evidence, upon the sum total of what must have flashed through his mind, that he recognized the officers instantly as the narcotics squad may fairly be inferred. While we do not have his exact words in the record, there was talk among them, and "He wanted to know what we were doing there." He then offered resistance and tried to close the door. He may have hoped to gain time to escape through the apartment. He knew Shepherd had brought in the money and could have realized from his experience that it was marked. He may have hoped to destroy all the marked money. Certainly $66 had already been concealed in his bed, and as it developed later, Mrs. Byrd had $34 of it among other bills totalling over $700 which she produced from her pocket upon request. He knew that Shepherd had left the apartment only minutes before with 100 capsules of narcotics, carried out by him for sale in furtherance of the narcotics traffic being conducted from his quarters.[34] That he already fully understood who the officers were and that they sought to arrest him cannot be doubted. Certainly the exact course to be taken by the officers in a split second of resistance was not the subject of a blueprint.

■ The officers were not confronted with a decision as to getting a warrant next day to arrest Miller and Mrs. Byrd. The arrest of Shepherd by itself would have put such hardened narcotics traffickers on notice to destroy whatever evidence there was of their complicity in the enterprise. The officers were confronted by the need for a decision arising from the necessitous circumstances of the situation. The District judge had to decide whether or not the conduct of the officers was reasonable, not whether some other course would have been better.

As Judge Washington wrote:

"To have left appellant at large in the house while one or both of the officers went to obtain an arrest warrant and a search warrant might perhaps be said to have been reasonable also, in spite of the risk of escape and destruction of evidence which that course would have entailed: but we certainly cannot say that the course which the officers did take was either unreasonable or forbidden by law. 'The relevant test is not whether it is reasonable to procure a search warrant, but whether the search warrant was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case.' United States v. Rabinowitz [citation]. Here the total atmosphere—the total situation—is such as to lead us to sustain the officers' action." [35]

■ The trial judge did not err in concluding that the attempt of the officers to arrest Miller at his doorway under the circumstances of this case was not unreasonable. The fact that his door chain was broken in the course of his resistance is immaterial and his arrest, immediately made, was justified. It follows that the limited specific search was lawful, and the marked bills were properly received in evidence. The proof of the guilt of Miller and Mrs. Byrd was thus overwhelming and unanswerable.

The convictions in both appeals are Affirmed.

---

34. He certainly was not in the category of Nueslein who "was not a bootlegger or a gambler *schooled in resistance to law.*" (Emphasis supplied.) Nueslein v. District of Columbia, supra note 16, 73 App.D.C. at page 89, 115 F.2d at page 694.

35. Ellison v. United States, 1953, 93 U.S. App.D.C. 1, 4, 206 F.2d 476, 479.

EDGERTON, Chief Judge (dissenting).

Officers arrested Clifford Reed, for whom they had a warrant, about 1:35 a. m. March 26, 1955. He told them he had been buying narcotics from appellant Shepherd who got them from appellants Miller and Byrd. The police arranged with Reed that he would make a purchase from Shepherd. About 3 a. m. Reed, in the presence of a narcotics agent, handed Shepherd marked money which the agent supplied. Under police surveillance, Shepherd then went to 1337 Columbia Road N. W. and entered the basement. After he came out and got into a cab, the police stopped it and saw him put something under its front seat. They found narcotics there, and also found that Shepherd no longer had the marked money.

The officers then went to the basement apartment at 1337 Columbia Road, which was occupied by appellants Miller and Byrd. One of the officers testified: "Officer Wurms knocked on the door and a voice from inside asked 'Who is there?' Officer Wurms repeated the name 'Blue,' called 'Blue' [a name by which Miller was known]. Then he said in a very low voice, 'Police'. The door was opened slightly, and it had a chain lock on it, and as the door was opened the man looked around the door, he tried to close the door. * * * he didn't want to let us in. * * * We forced the door open and forced our way into the room. * * I believe the chain latch on the door was broken." The officers immediately arrested Miller and Byrd in the apartment. They took some of the marked money from Byrd, searched the apartment, and found the rest of the money.

Miller and Byrd moved to suppress the money as evidence. The motion was overruled. Shepherd, Miller, and Byrd were all tried together and convicted.

In my opinion the search of the apartment was illegal and the motion to suppress should have been granted. The officers had no warrant of any sort. In my opinion they had no sufficient reason to suppose the evidence, which was money, would be destroyed if they waited till morning and got a warrant. "Where, as here, officers are not responding to an emergency, there must be compelling reasons to justify the absence of a search warrant." McDonald v. United States, 335 U.S. 451, 454, 69 S.Ct. 191, 193.

The arrests of Miller and Byrd do not excuse the search. "Of course, a search without warrant incident to an arrest is dependent initially on a valid arrest." United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 432. The arrests of Miller and Byrd were illegal for two reasons, even if the officers had probable cause to believe them guilty. (1) "Unless the necessities of the moment require that the officer break down a door, he cannot do so without a warrant; and if in reasonable contemplation there is opportunity to get a warrant, or the arrest could as well be made by some other method, the outer door to a dwelling cannot be broken to make an arrest without a warrant. The right to break open a door to make an arrest requires something more than the mere right to arrest. If nothing additional were required, a man's right of privacy in his home would be no more than his rights on the street; and the right to arrest without a warrant would be precisely the same as the right to arrest with a warrant. The law is otherwise." Accarino v. United States, 85 U.S.App.D.C. 394, 402, 179 F. 2d 456, 464. McKnight v. United States, 87 U.S.App.D.C. 151, 152, 183 F.2d 977, 978. (2) Just as in Accarino, the officers did not make known their reason for demanding entry but merely identified themselves as police. One of the officers testified that Miller "wanted to know what we were doing there," but it does not appear that they answered the question. I find no evidence, and the court cites no evidence, that supports an inference that Miller even recognized the officers as the narcotics squad.[1] As we

---

[1] I do not suggest that if he had recognized them they would have been relieved of the obligation to make known the cause of their demand for entry.

held in Accarino, "Before an officer can break open a door to a home, he must make known the cause of his demand for entry. There is no claim * * * that the officers advised the suspect of the cause of their demand before they broke down the door. Upon that clear ground alone, the breaking of the door was unlawful, the presence of the officers in the apartment was unlawful, and so the arrest was unlawful." 85 U. S.App.D.C. at page 403, 179 F.2d at page 465. Gatewood v. United States, 93 U.S. App.D.C. 226, 209 F.2d 789.

The denial of the motion of Miller and Byrd to suppress the illegally seized evidence was error that was prejudicial to Shepherd as well. His conviction as well as theirs should therefore be reversed. McDonald v. United States, 335 U.S. 451, 456, 70 S.Ct. 430.