336 F.2d 791
 Ralph R. BENSON, Petitioner-Appellant,
v.
PEOPLE OF the STATE OF CALIFORNIA, Peter Pitchess, Sheriff of Los Angeles County, and Leland Carter, Probation Officer of Los Angeles County, Respondents-Appellees.
 No. 19069.
 United States Court of Appeals Ninth Circuit.
 September 24, 1964.
 Rehearing Denied November 5, 1964.
 
 George W. Kell, Monterey Park, Cal., for appellant.
 Stanley Mosk, Atty. Gen. of Cal., William E. James, Asst. Atty. Gen. of Cal., William B. McKesson, Dist. Atty. for County of Los Angeles, Harry Wood, Harry B. Sondheim, Deputy Dist. Attys., County of Los Angeles, Los Angeles, Cal., for appellee.
 Before BARNES and JERTBERG, Circuit Judges, and McNICHOLS, District Judge.
 JERTBERG, Circuit Judge.
 
 
 1
 This is an appeal from a judgment of the United States District Court for the Southern District of California, Central Division, denying the petition of Ralph R. Benson, appellant herein, for a writ of habeas corpus. Jurisdiction of the District Court is based upon 28 U.S.C. § 2241(a). This court has jurisdiction to review on appeal a final order of the district judge refusing to issue a writ of habeas corpus when a certificate of probable cause has been granted. (28 U.S.C. § 2253.) Such certificate was granted in this case.
 
 
 2
 An information was filed in the Superior Court of the State of California, in and for the County of Los Angeles, against appellant, an attorney at law, and two co-defendants, one Isaac Matloff, a chiropractor, and one Edwin T. Harder, an osteopathic physician. In Count I of the information all three were charged with conspiracy to commit grand theft and to violate Section 556 of the California Insurance Code,[1] Count II charged all three with a violation of Section 556 of the Insurance Code on or about March 10, 1960. Count III charged another violation of Section 556 on or about April 28, 1960.
 
 
 3
 At approximately the midway point in the jury trial, Matloff and Harder entered pleas of guilty to a charge of attempting to violate Section 556 of the California Insurance Code, a lesser but necessarily included offense to that set forth in Count III of the information. Upon such occurrence the appellant waived trial by jury and the trial continued as a trial to the court. Upon close of the trial the judge adjudged appellant guilty on all three counts of the indictment. Appellant's motion for a new trial was denied, sentence was suspended, and appellant was granted probation for five years on condition that he first serve one hundred eighty days in jail and pay a fine of $5,000.00.
 
 
 4
 Appellant duly appealed to the District Court of Appeals of the State of California which affirmed the judgment of the trial court. See People v. Benson, 206 Cal.App.2d 519, 23 Cal.Rptr. 908. Petition for rehearing of the appeal was denied and a petition for hearing before the Supreme Court of the State of California was denied. Petition for certiorari to the United States Supreme Court was denied. (374 U.S. 806, 83 S.Ct. 1691, 10 L.Ed.2d 1030.) Petition for rehearing of the order denying certiorari was likewise denied. (375 U.S. 870, 84 S.Ct. 29, 11 L.Ed.2d 100.)
 
 
 5
 Appellant then filed his petition for habeas corpus in the District Court. The District Court issued an order to show cause to the Sheriff of Los Angeles County who filed a return denying that the appellant was in any way illegally restrained of his liberty for any of the reasons set forth in the petition, or for any other reason. The hearing on the petition was heard by the District Court and a set of exhibits which constituted a record of the entire trial and appellate proceedings hereinbefore outlined was received in evidence. After hearing, the District Court denied the writ of habeas corpus. The District Court filed a written memorandum and order.
 
 
 6
 The facts, largely undisputed, are set forth in great detail in the opinion of the District Court of Appeals of the State of California (People v. Benson, supra.) The interested reader is referred to that opinion for the detailed statement of the facts. For that reason we deem it unnecessary to restate them here in great detail. In skeletonized form it appears as follows: One William Bucholz was involved in a rear-end collision while driving his automobile. An employee of the garage to which the car was taken for repairs notified Matloff of the rear-end collision responsive to Matloff's offer of $25.00 for such information. Matloff paid an uninvited visit upon Bucholz at his residence and told him if he would say he had sustained a whiplash injury there would be no way to prove otherwise. Bucholz told Matloff that he had not been injured but Matloff told Bucholz that appellant, an attorney, would be in touch with him in the next few days. Bucholz said he would think it over. He then telephoned the police department and subsequently became a decoy for the District Attorney's Office. Pursuant to a call by Matloff, Potter, a young law clerk working in appellant's law office, was sent to the Bucholz residence. Bucholz told Potter that he wanted to sleep on it before he engaged appellant as his attorney. Potter tore up the papers he had brought for Bucholz to sign, and left. After the District Attorney's Office had installed recording equipment in the Bucholz' residence, Bucholz telephoned appellant saying he wished to speak to Potter again. During Potter's second visit, Bucholz explained how the accident happened and again told Potter he was not injured to which Potter replied, "then there is no personal injury case."
 
 
 7
 Matloff came to Bucholz' residence on six or seven occasions but administered only one treatment. Matloff's bill reflected twenty-six treatments. Matloff explained the bigger the bill the bigger would be Bucholz' recovery. Appellant forwarded Matloff's medical bills and reports to the insurance carrier for the other party to the rear-end collision.
 
 
 8
 Later Bucholz called appellant and made an appointment to see him about the case. Bucholz kept the appointment wearing a Minifon. During the course of the recorded conversation Bucholz told appellant he was not injured. This statement was repeated again by Bucholz in a later phone conversation with appellant.
 
 
 9
 Later Bucholz, accompanied by Robert Meng, an investigator for the District Attorney's Office, called upon Matloff. Posing as a person who had been recently involved in a rear-end collision [although such was not the fact], Meng told Matloff that he had not been injured but Bucholz advised him that he might make some money, to which statement Matloff agreed. At such visit Matloff stated: "You are always injured in a rear-end collision. You get a whiplash." On the same occasion Matloff stated that an additional doctor would lend greater support to Meng's claim of injury and treatment. Matloff stated that he and Harder had been working together with appellant for some time and that Harder would give the same diagnosis. Matloff then telephoned appellant who talked to Meng. Appellant asked if Meng was working. Meng said "No". Appellant replied, "You were working." Meng replied, "Well, okay."
 
 
 10
 Later Meng telephoned appellant. The conversation was recorded. The conversation was lengthy and is set forth in People v. Benson, supra. During that conversation Meng told appellant that he hadn't been hurt in the rear end collision and that he had lost no time from his work.
 
 
 11
 Later Meng telephoned appellant and arranged for an appointment at appellant's office. When Meng appeared at appellant's office he was wearing a Minifon which recorded the conversation. In substance, appellant stated that if Meng and the doctor were willing to say that the facts contained on Matloff's medical forms were correct, he was willing to go along with it. Meng again told appellant he was not injured. Appellant thereafter submitted the false bills and medical reports of Doctors Matloff and Harder to Meng's insurance carrier.
 
 
 12
 Evidence was also introduced, without objection, that appellant had forwarded to still another insurance carrier a false report of Harder pertaining to one Villabisencio. It appears that Villabisencio received a bill from Harder for fourteen visits, whereas the latter had seen Villabisencio not more than five times. When Villabisencio telephoned appellant about the matter, appellant said: "Well you sign it, I am your attorney, and if I tell you to sign it, you sign it; don't sign anything else unless I tell you." Villabisencio signed the bill which appellant submitted to the insurance carrier.
 
 
 13
 Appellant's first contention is that the conversations which took place in appellant's office between appellant and Bucholz and appellant and Meng, and transcriptions of the recordings of such conversations, should have been excluded by the California trial court on the ground that they were the fruits of an unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States, and compelled appellant to be a witness against himself, and deprived him of his liberty without due process of law in violation of his Fifth and Fourteenth Amendment rights. Appellant makes no contention that the trial court should have excluded, on the same ground, the telephone conversations between appellant and Bucholz and appellant and Meng, and the transcriptions of the recordings made of such conversations.
 
 
 14
 Under recent Supreme Court decisions it is clear that the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment render inadmissible in a state criminal trial all evidence obtained as a result of an illegal search and seizure, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and that the legality of a state search and seizure is to be measured, for purposes of the exclusionary rule, by the "fundamental criteria" of the Fourth Amendment, Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Since the exclusionary rule is itself a Constitutional dictate, Mapp v. Ohio, supra, the question of illegal search and seizure by state authorities of evidence for use in a state criminal trial is cognizable by the federal courts on application for a writ of habeas corpus.
 
 
 15
 Appellant urges: (a) that his consent to the entries into his office by Bucholz and Meng was obtained through fraud and misrepresentation in that neither one was a "real" client, neither one suffered injuries which would form the basis of claims against insurance companies, neither one was under the treatment of doctors and Meng had not been involved in an automobile accident; and (b) that such fraud and misrepresentation vitiated his consents to such entries, thereby causing such entries to be in derogation of the rights guaranteed to him by the Constitution of the United States; and (c) finally, that the conversations held between appellant and Bucholz, and appellant and Meng, and the transcriptions of the recordings of such conversations should have been excluded on the ground that they were the fruits of an unreasonable search and seizure and compelled appellant to become a witness against himself.
 
 
 16
 It is to be noted that at the time such consents to entry were given by appellant, he was aware that neither Bucholz or Meng had suffered injuries in any automobile accident. Appellant was not aware that Meng had not been involved in an automobile accident, nor was he aware that Bucholz was acting as a decoy and Meng was acting as an undercover agent for the District Attorney. Nor was he aware, at the time the conversations took place, that both Meng and Bucholz were wired for sound in the form of a concealed Minifon which each was wearing.
 
 
 17
 It is to be further noted that no tangible evidence was taken from appellant's office by either Bucholz or Meng, neither testified to any observations made by them while in appellant's office, nor was there any physical intrusion into the walls, furniture or equipment in the office by electronic or other devices which would permit conversations held therein to be overheard by persons other than those in the office. The only purpose which was served by the recordings of the conversations held in appellant's office was to furnish corroboration of the testimony of Bucholz and Meng.[2]
 
 
 18
 Before passing upon the validity of appellant's contention we will first review Appellate and Supreme Court decisions in the area. In Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), a private in the Army, attached to the Intelligence Department, and a business acquaintance of the defendant, Gouled, under direction of his superior officers, pretending to make a friendly call upon Gouled, gained admission to his office and in his absence, without warrant of any kind, seized and carried away several documents. One of these documents belonging to Gouled was introduced in evidence. It was held that it was the fruit of an unlawful search and seizure. The court stated at page 306, 41 S.Ct. at page 264:
 
 
 19
 "* * *, whether entrance to the home or office of a person suspected of crime be obtained by a representative of any branch or subdivision of the government of the United States by stealth, or through social acquaintance, or in the guise of a business call, and whether the owner be present or not when he enters, any search and seizure subsequently and secretly made in his absence falls within the scope of the prohibition of the Fourth Amendment, * *"
 
 
 20
 In Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), evidence obtained by tapping a telephone line where there was no physical invasion of the petitioner's premises was held not violative of the Fourth or Fifth Amendments to the Constitution. Discussing Gouled the court stated at pp. 463-464, 48 S.Ct. at pp. 567-568:
 
 
 21
 "Gouled v. United States carried the inhibition against unreasonable searches and seizures to the extreme limit. Its authority is not to be enlarged by implication, and must be confined to the precise state of facts disclosed by the record. * * * A stealthy entrance in such circumstances became the equivalent to an entry by force. There was actual entrance into the private quarters of defendant and the taking away of something tangible. Here we have testimony only of voluntary conversations secretly overheard.
 
 
 22
 "The amendment itself shows that the search is to be of material things — the person, the house, his papers, or his effects. The description of the warrant necessary to make the proceeding lawful is that it must specify the place to be searched and the person or things to be seized."
 
 
 23
 In Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), the court held that placing a detectapone against an office wall in order to listen to conversations taking place in the office next door did not violate the Fourth Amendment, since the eavesdropping had not been accomplished by means of an unauthorized physical encroachment within a constitutionally protected area. In discussing Olmstead the court stated that no reasonable or logical distinction could be drawn between the facts in the Goldman case and the facts in the Olmstead case. The court refused to overrule Olmstead but adhered to the opinion there expressed.
 
 
 24
 In On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), a federal agent who was acquainted with the petitioner entered petitioner's laundry and engaged him in an incriminating conversation. The agent had a microphone concealed upon his person. Another agent stationed outside with a receiving set was tuned in on the conversation and at the petitioner's trial related what he had heard. These circumstances were held not to constitute a violation of the petitioner's Fourth Amendment rights since no trespass was committed and the agent went into the petitioner's place of business with the consent, if not by the implied invitation, of the petitioner. The court stated that the authority of Gouled is sharply limited by Olmstead.
 
 
 25
 In Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), the eavesdropping was accomplished by means of an unauthorized physical penetration of a recording device into the premises occupied by petitioner. Evidence thus obtained was held violative of the rights guaranteed by the Fourth Amendment. In that case the Supreme Court refused to review its decisions in Olmstead, Goldman and On Lee but distinguished them on the ground that in those cases there had been no physical intrusion into the premises of the petitioners. The court stated at page 512, 81 S.Ct. at page 683:
 
 
 26
 "We find no occasion to reexamine Goldman here, but we decline to go beyond it, by even a fraction of an inch."
 
 
 27
 In Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), verbal incriminating statements made by petitioner, Toy, after his arrest without a warrant and without probable cause were excluded under the inhibition of the Fourth Amendment. In that case Toy operated a laundry. About 6:00 o'clock in the morning federal agents gathered at the laundry. Other federal agents remained nearby, out of sight, when federal agent Wong, who was of Chinese ancestry, rang the bell. When Toy appeared and opened the door, agent Wong told him that he was calling for laundry and dry-cleaning. Toy replied that he didn't open until 8:00 A.M., and told the agent to come back at that time. Toy started to close the door. Agent Wong then took his badge from his pocket and said, "I am a federal narcotics agent." Toy immediately slammed the door and started running down the hallway to his living quarters in the back. Agent Wong and the other federal officers broke open the door and followed Toy into the bedroom where he was arrested. Toy's verbal, incriminating statement was obtained several days afterwards on questioning by a narcotic agent.
 
 
 28
 In Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), an agent of the Internal Revenue Service was investigating possible evasion of excise taxes in the area where Lopez conducted an inn. He described Lopez' inn in a report to his superiors as a "potential delinquent." On a return visit to the inn, the agent spoke to Lopez and advised him that he thought the inn would be liable for a cabaret tax and asked to see the books. After further discussion, Lopez gave to the agent a sum of money which, from the context, was a bribe. Lopez asked the agent to return at a later date. The agent reported his meeting with Lopez to his superiors and turned over the money which he had received. The agent was then instructed to keep the appointment with Lopez, to "pretend to play along with the scheme." The agent was then equipped with two electronic devices, a pocket battery-operated transmitter, (which subsequently failed to work), and a pocket wire recorder which recorded the conversation between Lopez and the agent at his meeting later in the day. The agent suggested that they talk inside Lopez' office and thereafter Lopez engaged in some incriminating conversation while inside his office. The Supreme Court upheld the conviction of Lopez and the introduction into evidence of the agent's testimony regarding his conversations with Lopez, as well as the admissibility of the tape recording of that conversation. Lopez contended that in view of the agent's alleged falsification of his mission, he gained access to Lopez' office by misrepresentation and all evidence obtained in the office was illegally seized. At page 438, 83 S.Ct. at page 1387 the court states:
 
 
 29
 "[The agent] was not guilty of an unlawful invasion of petitioner's office simply because his apparent willingness to accept a bribe was not real. Compare Wong Sun v. United States, 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441]. He was in the office with petitioner's consent, and while there he did not violate the privacy of the office by seizing something surreptitiously without petitioner's knowledge. Compare Gouled v. United States, supra. The only evidence obtained consisted of statements made by Lopez to Davis, statements which Lopez knew full well could be used against him by Davis if he wished. We decline to hold that whenever an offer of a bribe is made in private, and the offeree does not intend to accept, that offer is a constitutionally protected communication."
 
 
 30
 In Todisco v. United States, 298 F.2d 208 (9th Cir. 1961), Cert. den. 368 U.S. 989, 82 S.Ct. 602, 7 L.Ed.2d 527 (1962), appellant, an attorney at law, was representing a client in attempting to negotiate a compromise settlement of a tax liability as assessed by the tax court. In the course of negotiations, appellant made several statements to a revenue agent assuring him of rewards in the event of a favorable settlement. These overtures were reported by the agent to his superiors. Conversations referred to took place in the appellant's law office during which the agent was equipped with a Fargo device, being a miniature radio transmitter. The conversations in their entirety were transmitted and recorded at the point of reception. The upshot of these conversations was an agreement that upon the agent's acceptance of a settlement, appellant's fee was to be split between them. Appellant contended that the recording of his conversation violated the Fourth and Fifth Amendments of the United States Constitution. This court concluded that no constitutional right of appellant was violated by the manner in which the tapes were secured, or by their admission into evidence. The same result, under a similar state of facts, was reached by this court in Carbo v. United States, 9 Cir., 314 F.2d 718 (1963), Cert. den. 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964).
 
 
 31
 Other Circuit Courts of Appeal have held that evidence obtained by law enforcement officers using the subterfuge of hiding their identity in order to pose as members of the general public is admissible. See, United States v. Bush, 283 F.2d 51 (6th Cir. 1960), cert. den. 364 U.S. 942, 81 S.Ct. 461, 5 L.Ed.2d 373 (1961); Whiting v. United States, 321 F.2d 72 (1st Cir. 1963), Cert. den. 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963).
 
 
 32
 In addition to Gouled v. United States, supra, and Wong Sun v. United States, supra, both of which we have reviewed above, appellant cites the following Federal Court decisions which he claims also support his contentions: United States v. Mitchneck, D.C., 2 F.Supp. 225 (1933); Fraternal Order of Eagles v. United States, 57 F.2d 93 (3rd Cir. 1932); Gatewood v. United States, 93 U.S.App.D.C. 226, 209 F.2d 789 (1953). We have reviewed the decisions in the cases last cited and find that the facts therein appearing clearly distinguish them from the facts in the instant case.
 
 
 33
 From our review of the decisions of the Supreme Court which we have cited, we conclude under the circumstances of this case that there was no violation of any Constitutional right upon which appellant relies. We further conclude that the conduct of the law enforcement officers was not "dirty business" or unfair in such a manner as to deprive the appellant of due process.
 
 
 34
 It appears to us that the conduct of the law enforcement officers in this case was within the permissible "[a]rtifice and strategem [which] may be employed to catch those engaged in criminal enterprises." Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). See also Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).
 
 
 35
 Appellant's contention that the state trial court failed to pass on whether or not there was an unlawful search and seizure is without merit. On several occasions the trial court overruled appellant's objections to the admission of evidence relating to conversations and the recordings thereof. References to questions of the trial court in that connection on one such occasion concerning probable cause for arrest fall short of supporting appellant's contention that the trial court "went off on a tangent" or failed to apply proper constitutional standards in the admission of such evidence.
 
 
 36
 The remaining contentions of appellant on this appeal, in our view, are no more than attempts to procure a review in this court on questions of California law. No useful purpose would be served by setting forth such contentions in detail. Suffice it to say that appellant asserts the state court misapplied the law relating to the defense of entrapment;[3] that the court erroneously admitted hearsay evidence; that it misinterpreted the California Insurance Code; that it did not correctly apply the law of scienter; and that the District Court of Appeals for the State of California relied on a non-existent "concession".
 
 
 37
 As stated in United States of America ex rel. Walter Hall v. People of the State of Illinois, 329 F.2d 354 (7th Cir. 1964) at page 359:
 
 
 38
 "The protections embedded in due process are flexible. As society matures, they change to meet its needs and social goals. When the several states have consistently discharged their responsibility to society in giving full recognition of their constitutional obligation to prevent the prostitution of state judicial power through lawless enforcement of the criminal law, the need for federal intervention is not apparent. To hold otherwise would compel federal intrusion, under the guise of constitutional concern, into the daily operation of the state judicial process. We find no justification for such drastic procedure in the resolution of the case at bar."
 
 
 39
 The judgment appealed from is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Section 556 states as follows:
 "It is unlawful to:
 "(a) Present or cause to be presented any false or fraudulent claim for the payment of a loss under a contract of insurance.
 "(b) Prepare, make, or subscribe any writing, with intent to present or use the same, or to allow it to be presented or used in support of any such claim.
 "Every person who violates any provision of this section is punishable by imprisonment in the State prison not exceeding three years, or by fine not exceeding one thousand dollars, or by both."
 The defendants were charged with violating both subdivisions (a) and (b) of this section in Counts II and III of the information.
 
 
 [2]
 See dissenting opinion of Mr. Justice Brennan in Lopez v. United States, infra, 373 U.S. at p. 448, 83 S.Ct. at p. 1392 to the effect that Minifon recordings are independent third-party evidence
 
 
 [3]
 The defense was not raised in the trial court